**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>ATTORNEY GENERAL OF ARIZONA,<br><br>ATTORNEY GENERAL OF COLORADO,<br><br>STATE OF INDIANA, and<br><br>UTAH DIVISION OF CONSUMER PROTECTION,<br><br>Plaintiffs,<br><br>v.<br><br>PROGRESS RESIDENTIAL, LLC, a limited liability company,<br><br>and<br><br>PRETIUM PARTNERS, LLC, a limited liability company,<br><br>Defendants. | Case No. ____________<br><br>**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF** |

Plaintiffs, the Federal Trade Commission ("FTC" or "Commission"); the Attorney General of Arizona ("State of Arizona"); Philip J. Weiser, the Attorney General of Colorado ("Colorado Attorney General"); the State of Indiana; and the

Utah Division of Consumer Protection ("State of Utah") (collectively, "Plaintiffs"), for their Complaint allege:

1. The Federal Trade Commission brings this action for Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a); the Gramm-Leach-Bliley Act ("GLB Act"), 15 U.S.C. §§ 6801-6809, §§ 6821-6827; and the Consumer Review Fairness Act ("CRFA"), 15 U.S.C. § 45b. For these violations, the FTC seeks relief, including a permanent injunction, monetary relief, and other relief, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b; Section 521 of the GLB Act, 15 U.S.C. § 6821; and the CRFA, 15 U.S.C. § 45b.

2. The State of Arizona *ex rel* Kristin K. Mayes brings this action for the Defendants' violations of the Arizona Consumer Fraud Act ("ACFA"), Arizona Revised Statutes ("A.R.S.") §§ 44-1521 to 44-1534. For these violations, the State of Arizona seeks to obtain permanent injunctions, restitution, and other equitable relief, and reimbursement of costs and attorneys' fees for the Defendants' unlawful acts and practices.

3. Plaintiff Philip J. Weiser, Attorney General for the State of Colorado, in his official law enforcement capacity, ("Colorado Attorney General") brings this action for Defendants' violations of the Colorado Consumer Protection Act ("CCPA"), C.R.S. § 6-1-101 *et seq*. For these violations, the Colorado Attorney General seeks relief, including a permanent injunction, monetary relief, costs,

attorney fees, and other relief pursuant to C.R.S. §§ 6-1-110, 6-1-112, and 6-1-113.

4. The State of Indiana brings this action for Defendants' violations of Indiana's Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5, and Indiana's Home Loan Practices Act, Ind. Code § 37-5. For these violations, Indiana seeks relief, including a permanent injunction, restitution, costs, and other appropriate relief as authorized by Ind. Code §§ 24-5-0.5-4(c) and 37-5-8-3.

5. The Utah Division of Consumer Protection brings this action for Defendants' violations of the Utah Consumer Sales Practices Act ("UCSPA"), Utah Code §§ 13-11-4 and 13-11-5. For these violations, Utah seeks relief, including a permanent injunction, monetary relief, and other relief pursuant to Utah Code Annotated Sections 13-11-41, *et seq*.

## SUMMARY OF THE CASE

6. Progress Residential, LLC ("Progress") is one of the largest landlords of single-family rental homes in the United States. It currently manages over 90,000 rental homes across 17 states.

7. Progress's value proposition is "we make things easy." Progress promises consumers that it will deliver "lease and fee transparency," inspected and "move-in ready" homes, "outstanding service," and "clear and timely communication." Progress also promises consumers it will only deduct their security deposits for damage they cause beyond normal wear and tear to a home.

Overall, Progress draws consumers in by advertising a "dream rental home" experience with "convenience and hassle-free living."

8. But internally, the company's executives admit the truth: Progress provides a "Broken Customer Experience," or as a Progress senior marketing executive put it, "we are not delivering on our promise." (emphasis in original). For years, Progress has routinely charged consumers hidden monthly fees after misleading them with false rental prices, charged a host of other deceptive and unlawful one-time and situational fees throughout their leases, delivered homes without inspecting or repairing them before consumers move in, deducted consumers' security deposits for illegitimate charges, and dodged customer service requests for serious maintenance issues and billing errors. Progress also harms consumers by using illegal contract terms that prohibit consumers from posting negative reviews. When discussing consumer complaints about several of these issues, a marketing executive in charge of monitoring Progress's relationship with the Better Business Bureau ("BBB") and BBB complaints even noted that it "doesn't take long for people to realize they're in for a long ride."

9. Progress is wholly owned by the private equity investment firm Pretium Partners, LLC ("Pretium"). Through a complex array of investment funds and wholly-owned entities, Pretium indirectly owns nearly all the homes that are managed by Progress, which Pretium founded in 2014 to be the property manager

for its homes. Pretium oversees, exercises control over, and is actively involved in Progress's property management operations, including finance and budgeting, property acquisitions and dispositions, addressing consumer complaints, and overall business strategy.

10. Progress and Pretium ("Defendants") have known for years that their practices harm consumers. In 2021, the Better Business Bureau sent Progress a notice about the "pattern of customer complaints" the BBB had received about the company, noting that Progress "fails to provide a detailed explanation of unexpected and incorrect charges and fees," "fails to address and rectify billing issues," "fails to timely respond to maintenance and repair issues," and "fails to respond to consumer inquiries after multiple attempts to reach the business were made." Pretium was informed when Progress lost its accreditation with the BBB in 2022 and monitors Progress's relationship with the BBB, including Progress's handling of consumer complaints submitted to the BBB.

11. In 2022, a consulting firm's presentation to Progress senior executives found there was "a need for pricing transparency" as residents "don't always know what additional charges will be included in their monthly payment." A Progress report from that year, for example, concluded that Progress's "tenants are being charged more than the agreed-upon amount for rent," and that "tenants are being charged for things that should be included in their rent." The 2022 consulting firm

presentation to Progress senior executives also stated that over half of residents cited "service issues as [the] move-out reason," and an internal Progress report noted a "rise in cleanliness & maintenance complaints upon move-in." A 2023 internal Progress report circulated to numerous Progress executives, including the CEO, Co-Presidents, and CFO, highlighted the reason why tenants complained: "There are additional costs besides rent which is associated to renting a home with Progress Residential. *Currently, we lack transparency in our application process regarding the additional monthly costs including Rentable items*[1] *and taxes*." (emphasis added).

12. In 2023, an additional internal report found that billing disputes and security deposit refunds were two of the four main issues consumers complained about to both Progress's and Pretium's executive teams.

13. In 2024, an internal report to Progress executives—which was then forwarded to Pretium executives—found that "[t]enants express deep dissatisfaction with Progress's communication, trustworthiness, and handling of issues," and it specifically flagged consumers' complaints regarding "move-out experiences," "unfair charges," and "high anxiety around securing security deposits and avoiding extra charges." The report compiled these findings from the

[1] According to Progress's policies, "Rentable items" allow Progress to "charge residents for any additional services (Smart Home, Air Filters, Landscaping, etc.) on a property level."

Facebook group "Victims of Progress Residential," which Progress has closely monitored for years and which has grown to over 15,000 members since its creation in 2017. A 2024 Progress report on its move-out and security deposit deduction processes—shared with Pretium executives—found that Progress had "no defensible standards/transparency on what and when we should charge a resident['s security deposit]."

14. In another 2024 internal report, which discussed the poor move-in conditions of many of its homes, Progress admitted that "[w]e historically push back/cancel some [work order] requests" in the first thirty days after consumers move in "as part of an 'as is' expectation setting with residents." In fact, Progress has a policy (undisclosed to consumers)—which Pretium knows about—of using Photoshop to advertise and present its homes so they appear move-in ready, instructing employees and vendors to use Photoshop to remove dirt from walls and carpets, insert appliances in place of existing broken, missing, or old appliances, and fix other conditions that prevent a home from being move-in ready.

15. Despite these reports, Progress and Pretium executives have refused to correct their harmful practices for the sake of higher profits. In 2023, after learning that Progress had failed to refund certain fees that consumers were entitled to, the company's then-CEO directed his subordinates not to make any changes, explaining that "…I am not taking $1M impact to do the right thing." And in 2024,

a Progress executive inquired about whether Progress's competitors were displaying mandatory fees and the total monthly rental price in their home listings, asking: "Have people checked if our peers are doing this? Supportive since we have to move in this direction. [Pretium's CEO] just didn't want to get caught doing it before everyone else did."

16. Despite this knowledge, Progress and Pretium continue to deceive and harm consumers with these practices, which have generated tens of millions of dollars for the companies.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355.

18. Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(2), and (d), 1395(a), and 15 U.S.C. § 53(b).

## PLAINTIFFS

19. The FTC is an agency of the United States Government created by the FTC Act. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces Section 521(a) of the GLB Act, 15 U.S.C. § 6821(a)(2), which prohibits "making a false, fictitious, or fraudulent statement or representation" "to obtain or attempt to obtain…customer information

of a financial institution." The FTC also enforces the CRFA, 15 U.S.C. § 45b(c). The CRFA prohibits the offering of provisions in form contracts that restrict individual consumers' ability to communicate reviews, performance assessments, and similar analyses about a seller's products, services, or conduct.

20. Kristin K. Mayes, Attorney General for the State of Arizona, is authorized to bring this action to enforce the provisions of the Arizona Consumer Fraud Act ("ACFA"), Arizona Revised Statutes ("A.R.S.") §§ 44-1521 to 44-1534.

21. Philip J. Weiser is the duly elected Attorney General of the State of Colorado and is authorized under C.R.S. § 6-1-103 to enforce the provisions of the Colorado Consumer Protection Act.

22. The State of Indiana is one of fifty sovereign states of the United States of America. Todd Rokita is the duly elected Attorney General of the State of Indiana and is empowered by Ind. Code §§ 4-6-12-3(a)(3)(B), 24-5-0.5-4(c), and 37-5-8-3 and brings this action to protect the public interest and pursuant to his powers *parens patriae*.

23. The Utah Division of Consumer Protection (the "Division") is a state agency within the Utah Department of Commerce. Utah Code § 13-2-102. The Division enforces Utah's consumer protection laws, including the UCSPA, which prohibits deceptive and unconscionable acts and practices in connection with consumer transactions. Utah Code §§ 13-2-102(2), 13-11-1, *et*

*seq.*

## DEFENDANTS

24. Defendant Progress is a Delaware limited liability company with its principal place of business at 7500 N. Dobson Rd., Suite 300, Scottsdale, AZ 85256. Progress is wholly owned by Pretium. Progress transacts or has transacted business in this District and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, Progress has advertised, marketed, promoted, offered, leased, and managed the rental of single-family homes to consumers throughout the United States (together, "Home Rental Services").

25. Defendant Pretium is a Delaware limited liability company with its principal place of business at 60 Columbus Circle, 19th Floor, New York, NY 10023. Founded in 2012, Pretium is a private equity investment firm that describes itself as "a leading owner and operator of single-family residential homes in the United States." It manages multiple investment funds, which in turn own multiple limited liability companies, through which Pretium owns most of the 90,000+ homes managed by Progress. Pretium founded Progress in 2014 to be the property manager for these homes. Pretium transacts or has transacted business in this District and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, Pretium has engaged in Home Rental

Services.

## COMMERCE

26. At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

### I. Progress's Deceptive and Unfair Pricing and Fees

27. Progress employs deceptive and unfair pricing and fee practices in both its monthly advertised rental prices and its one-time and situational fees. First, Progress falsely advertises the total monthly rental price by failing to include in that price the mandatory monthly fees. Second, Progress misrepresents, fails to disclose, and improperly charges various one-time fees and fees that are situation-based. Taken together, these myriad hidden and improper fees caused millions of dollars in harm to consumers.

#### Progress Falsely Advertises the Total Monthly Rental Price

28. Progress advertises that consumers can rent a home for a set "Per Month" price. However, this advertised rental price is false because it fails to include multiple mandatory monthly fees that consumers must pay on top of the advertised rent. Consumers pay nonrefundable, upfront fees to apply for a Progress listing and reserve the property, only to learn later that the actual total monthly

rental price for that home is higher than advertised.

29. Until it learned of the FTC's investigation in November 2024, Progress only revealed the true cost of a rental home ***after*** collecting the application and holding fees from consumers who submit rental applications. Additionally, since at least 2021, Progress has added undisclosed mandatory fees to residents' monthly rental cost, including: smart home fee ($17–$30/month), utility management fee ($7.95–$9.99/month), air filter fee ($9.99/month), pool fee ($100–$175/month), septic tank fee ($40/month), resident benefit package fee ($15/month), landscaping fee ($35–$120/month), and pest control fee ($10/month).

30. These mandatory monthly recurring fees—some charged to all residents, while others are tied to specific homes—can add tens to hundreds of dollars to the rent each month, costing residents hundreds or thousands of dollars over a year. Yet the fees are hidden from consumers and not included in the advertised total monthly rental price. Because the fees are omitted from the advertised monthly rental price, Defendants systematically mislead consumers searching for rental housing, undermining consumers' ability to accurately compare Progress's home prices with the prices of other companies' homes.

31. Since 2022, consumers have paid tens of millions of dollars in application fees, holding fees, and mandatory monthly fees for listings that were deceptively priced by Progress.

Progress's Home Listings and Application Process

32. While Progress's home listings have changed multiple times since 2021, virtually all versions have failed to include all mandatory monthly fees in the advertised monthly rental price.

33. Potential residents who visit Progress's website, www.rentprogress.com, can search for a home by entering various specifications, including maximum monthly rental price. A typical page displaying the search results has looked as shown in Figure 1 below:

**Figure 1.**




(Image from June 2024)

This search results page displays the purported monthly ("/mo") rental price for

each home; but the price does not include any mandatory monthly fees.

34. When consumers click on a home on the search results page, they go to a property-specific listing page, which has photographs of the property and additional information. The "Per Month" price of the home—which does not include any mandatory monthly fees—is prominently displayed at the top of the listing. A typical home listing page has looked as shown in Figure 2 below:

**Figure 2.**



(Image from late 2021; highlight in original produced document).

35. When consumers click on the "Apply Now" button at the top of the listing, they are redirected to Progress's rental application portal where they can select a move-in date and length of lease term. The "Rent" amount displayed on the portal also does not include all mandatory monthly fees. A typical version of the portal has looked like below:

**Figure 3.**




(Image from 2024/2025)

36. Progress also advertises its home listings through third-party internet listing sites ("ILSs"), such as Zillow and Trulia, where the monthly rental payment is prominently displayed in search engine results and the listing itself. Just as with

Progress's website listings, the advertised rental price on the ILSs does not include mandatory monthly fees.

37. Since at least 2021, and continuing through present day, Progress has failed to advertise the true monthly price that consumers must pay to rent one of its properties because the company charges mandatory monthly fees on top of the advertised rent. This is consistent across the monthly ("/mo") price displayed in Progress's search results page, the advertised "Per Month" price on the home listing page, and the "Rent" displayed in the application portal. As a result, consumers typically pay between $30 and $330 or more per month than the advertised monthly rental price.

<u>Progress Conceals Mandatory Monthly Fees that Consumers Must Pay to Rent Homes</u>

38. To the extent Progress includes information about its mandatory add-on fees in its home listings, Progress does not present this language in an easily noticeable or understandable manner, and the information in Progress's home listings does not clarify which fees are required for a specific home. For instance, in Fall 2021, information about some, but not all, fees was located at the bottom of the listing, which said "Additional Monthly Fees" without further explanation, as depicted in Figure 2 above (highlight in original). Under "Additional Monthly Fees," the listing did not explain whether a fee was mandatory or optional, nor did it include all mandatory monthly fees. As just one example, the utility management

fee was a mandatory monthly fee that was not listed.

39. Subsequent amendments Progress made to its home listings did not cure its false and deceptive price representation. In or around September 2022, Progress added text under the advertised "Per Month" price on the listing page ("plus applicable fees (see below)"). But Progress provided no further explanation beyond its reference to "applicable fees" in the listing. As shown below (Figure 4), only in the *seventh* paragraph in small text at the very bottom of the listing, Progress instead stated: "Additional fees may apply, including an application fee, holding fee, lease administration fee, utility account set-up fee, and pet fees (where applicable)." And even if seen or read by consumers, that text included no comprehensive list of all mandatory fees, identified no mandatory fees for that particular listing, and included no fee amounts. The result is that even at this stage, consumers still do not have an accurate understanding of their total monthly rent.

**Figure 4.**




(Red arrow graphic added)

40. After learning of the FTC's investigation in late 2024, Progress revised its home listing pages to itemize more fees, but Progress's website listings still advertise a monthly rental price that fails to include all mandatory monthly fees.

41. Progress's listings on third-party ILSs like Zillow and Trulia likewise continue to advertise a false monthly rental price and similarly fail to adequately disclose to consumers that their ongoing monthly rent obligation includes mandatory add-on fees. In fact, in September 2025, Zillow began including a "Total monthly price" badge and checkmark on property listings that advertised the total monthly rental price. Yet even after this change, Progress instructed Zillow not to display the total monthly rental price on all of Progress's listings and instead continue to advertise the false monthly rental price without any mandatory monthly fees.

42. Ultimately, many consumers have learned that the advertised "Per Month" price is not the true total monthly rental price ***only after*** their application is approved and they confirm their move-in date, at which point they receive their lease and an accompanying "cost sheet." The cost sheet itemizes all mandatory add-on fees and informs consumers the true total monthly rental price for the specific house the consumer is leasing. By then, consumers have already paid a strictly nonrefundable application fee up to $55 per applicant over 18 years of age,

and many have paid a holding fee up to $500 to exclusively reserve a home—which is nonrefundable if the consumer decides not to sign a lease, absent a few exceptions. Many of these consumers have also paid moving costs and given notice to end their prior leases, often leaving them with no other option than to sign the lease with Progress or risk not having a place to live.

43. Simply put, Progress's advertised rental prices are false because, for years, consumers could not and still cannot lease a Progress home by paying only the advertised "Per Month" price. And consumers still complain about being deceived by the false total monthly rental price advertised in Progress's home listings. For example, one consumer complaint from April 2026 stated, "Progress Residential is operating under false impression. Their homes are listed for one price however upon signing the lease additional fees are added to the monthly bill."

**Progress Deceptively and Unfairly Charges One-Time and Situational Fees**

44. For years, Progress has charged consumers a host of one-time and situational fees, including but not limited to:

a. holding fees ($250 before July 2024; $500 after July 2024–present)

b. lease administration fees ($125 at move-in)

c. renter's insurance exemption fees ($14.95/month)

d. HOA violation fees ($45/violation notice)

e. late fees (typically $125–$150/violation).

45. As discussed in more detail below, Progress misrepresents when it will charge these fees, fails to disclose or adequately disclose the existence and nature of these fees, and unfairly charges these fees even when consumers do not owe the fees.

Holding Fees

46. Progress falsely represents the timing and circumstances of when it refunds holding fees to consumers.

47. Before July 2024, Progress charged a $250 holding fee for both "move-in ready" and "coming soon" homes. Progress would remove a listing from circulation upon receipt of the application and payment of the holding fee. Since July 2024, Progress has charged a $500 holding fee only for "coming soon" homes, wherein an applicant must pay a holding fee and sign a "Pre-Leasing Hold Fee Agreement" to exclusively reserve the home while it is prepared for move in.

48. Progress stated on multiple pages of its website, including the FAQs page, that if a prospective resident's application is denied, "this holding fee will be returned to you within 30 business days." And in its Pre-Leasing Hold Fee Agreements, Progress promises to refund the holding fee if the home is not available on the agreed-upon move-in date. Otherwise, the holding fee is not refundable—including instances where a consumer decides not to proceed with

renting a Progress home. If a consumer does proceed with renting a Progress home, the holding fee is typically applied to the first month's rent.

49. In numerous instances, though, Progress fails to refund holding fees within 30 business days—or at all—when applicants are denied or when a home is not available on the agreed-upon move-in date.

Lease Administration Fees

50. If consumers decide to proceed with signing a lease, Progress charges a one-time $125 "lease administration fee" that is due with a consumer's move-in funds.

51. Progress does not adequately disclose the existence or the amount of the lease administration fee before someone submits a rental application. Rather, Progress buries conditional language about the lease administration fee in its typical home listing page and behind hyperlinks that lead to dense webpages. For example, in September 2022, Progress's home listings (as shown in Figure 4 above) stated in tiny font in the seventh paragraph that "[a]dditional fees may apply, including an application fee, holding fee, lease administration fee, utility account set-up fee, and pet fee (where applicable)"—without stating the amount of the fee or that it is mandatory.

52. In fact, most versions of Progress's home listings—including revisions Progress made since learning of the FTC's investigation—make no

reference to the lease administration fee, instead burying general fee information behind hyperlinks that consumers do not have to click before applying.

53. In numerous instances, consumers do not see any reference to the lease administration fee until they receive a copy of their cost sheet—after they have already paid nonrefundable application and holding fees and at the time consumers are sent the lease to sign, which they typically must do within 24 or 48 hours of receipt and after many consumers have terminated their previous leases.

Renter's Insurance Exemption Fees

54. As part of its leases, Progress also requires residents to either obtain and provide proof of renter's insurance to cover the resident's personal property and liability, or pay a $14.95/month "renter's insurance exemption fee" that does not constitute renter's insurance. But like its other one-time and situational fees, Progress misrepresents and fails to adequately disclose to consumers the amount and frequency of the $14.95/month exemption fee, as well as the circumstances in which it is charged. Progress instead hides this fee behind dense webpages, in an addendum buried in the middle of a nearly 40-page lease, and in tiny font at the bottom of its move-in cost sheets. Due to these practices, consumers typically discover this monthly fee only after moving in when the exemption fee appears on their resident account ledger.

55. Progress also did not include any information about the renter's

insurance exemption fee in its home listing pages until 2026, long after learning of the FTC's investigation. Despite revising its home listing pages in 2026 to mention this fee, Progress fails to include the amount of the fee in its listing or when and how frequently the fee is charged.

56. Progress does not even give notice of this possible fee among the itemized fees in the move-in cost sheet provided to consumers with their lease. Instead, Progress buries information about its renter's insurance requirement and accompanying exemption fee in tiny print at the bottom of the cost sheet. Figure 5 below shows a typical cost sheet with the exemption fee highlighted and Figure 5(a) enlarging the bottom sentence in which Progress discloses the exemption fee:

**Figure 5.**



Progress Residential

Residents: [redacted]

Property Address: [redacted]

City/State/Zip: [redacted] GA 30052

Resident Email: [redacted]

Resident Code: [redacted]

| | | |
|---|---|---|
| Monthly Rent (Month 1-12) | $ | [illegible] |
| Short Term Lease Premium Fee | $ | - |
| Monthly Security Deposit Waiver Fee (Month 1-12) | $ | - |
| Monthly Pool Fee (Month 1-12) | $ | - |
| Monthly Smart Home Fee (Month 1-12) | $ | [illegible] |
| Monthly Pet Rent (Month 1-12) | $ | [illegible] |
| Monthly Landscaping Fee (Month 1-12) | $ | - |
| Monthly Pest Control Fee (Month 1-12) | $ | - |
| Monthly Amenity Fee (Month 1-12) | $ | - |
| Monthly Trash Service (Month 1-12) | $ | - |
| Monthly Solar Fee (Month 1-12) | $ | - |
| Monthly Internet Service Fee (Month 1-12) | $ | - |
| Monthly Concierge Fee (Month 1-12) | $ | - |
| **Total Monthly Rent (Month 1-12):** | $ | [illegible] |
| Monthly Rent (Month 13+) | $ | [illegible] |
| Monthly Pool Fee (Month 13+) | $ | - |
| Monthly Smart Home Fee (Month 13+) | $ | [illegible] |
| Monthly Security Deposit Waiver Fee (Month 13+) | $ | - |
| Monthly Pet Rent (Month 13+) | $ | [illegible] |
| Monthly Landscaping Fee (Month 13+) | $ | - |
| Monthly Pest Control Fee (Month 13+) | $ | - |
| Monthly Amenity Fee (Month 13+) | $ | - |
| Monthly Trash Service Fee (Month 13+) | $ | - |
| Monthly Solar Fee (Month 13+) | $ | - |
| Monthly Internet Service Fee (Month 13+) | $ | - |
| Monthly Concierge Fee (Month 13+) | $ | - |
| **Total Monthly Rent (Month 13+):** | $ | [illegible] |
| Lease Term: | 24 | Months |
| Lease Dates: | [illegible] to [illegible] | |

**PLEASE NOTE:** [illegible]

**MOVE-IN CHARGES:**

| | |
|---|---|
| $ - | First Month Rent |
| $ - | First Month Pet Rent |
| $ - | First Month Smart Home Fee |
| $ - | First Month Security Deposit Waiver Fee |
| $ - | First Month Pool Fee |
| $ - | First Month Landscaping Fee |
| $ - | First Month Pest Control Fee |
| $ - | First Month Amenity Fee |
| $ - | First Month Trash Service Fee |
| $ - | First Month Solar Fee |
| | First Month Internet Service Fee |
| $ - | First Month Concierge Fee |
| $ [illegible] | Pro-Rated Rent |
| $ [illegible] | Pro-Rated Pet Rent |
| $ [illegible] | Pro-Rated Smart Home Fee |
| $ - | Pro-Rated Security Deposit Waiver Fee |
| $ - | Pro-Rated Pool Fee |
| $ - | Pro-Rated Landscape Fee |
| $ - | Pro-Rated Pest Control Fee |
| $ - | Pro-Rated Amenity Fee |
| $ - | Pro-Rated Trash Service Fee |
| $ - | Pro-Rated Solar Fee |
| $ - | Pro-Rated Internet Service Fee |
| $ - | Pro-Rated Concierge Fee |
| $ [illegible] | Application Fee |
| | Pet Fee |
| | Other |
| $ [illegible] | Admin Fee |
| | Pet Deposit |
| $ 748.33 | Security Deposit Installment |
| $ - | Cleaning Fee |
| $ [illegible] | TOTAL CHARGES |

**MOVE-IN CREDITS:**

| | |
|---|---|
| | Holding Fee paid |
| $ [illegible] | App. Fee paid |
| $ - | Concession |
| | Pet Deposit Paid |
| $ - | Security Deposit Paid |
| $ - | Applicable Rental Payment |
| $ [illegible] | TOTAL CREDITS |

Transfer:
From Tribeca #

**Unpaid Charges/Unapplied Credits:**

| | |
|---|---|
| $ - | Fees to be Charged |
| $ - | Credits to be Applied |

**TOTAL CONCESSION:**

Amount | Type

**TOTALS:**

| | |
|---|---|
| $ 3,204.60 | **Balance Due** |
| $ - | **Pet Deposit** |
| $ 748.33 | **Security Deposit** |
| 2,456.27 | **Subtotal (Rent, Fees, Etc.)** |

**Important Information:**

[illegible]

(highlight added to original)

**Figure 5(a).**

Thank you for leasing at Progress Residential. As described in your lease, residents are required to maintain personal liability insurance with a minimum limit of $100,000. If sufficient proof of insurance is not emailed to Progress@EffectiveCoverage.com within 7 days of your move-in, you will be charged a $14.95 exemption fee.

57. Only in the middle of tiny text at the very bottom of the cost sheet does any purported disclosure language appear, providing: "If sufficient proof of insurance is not emailed to Progress@EffectiveCoverage.com within 7 days of your move-in, you will be charged a $14.95 exemption fee." Even if consumers were to see this tiny, buried language, the text falsely states that consumers will be charged "a $14.95 exemption fee," when in fact the fee charged is a $14.95 *per month recurring* fee. The language also does not make clear that the fee does not constitute renter's insurance.

58. Furthermore, Progress's representation is false because even when consumers do provide proof of renter's insurance coverage, in numerous instances, Progress still charges many consumers a monthly $14.95 renter's insurance exemption fee.

<u>HOA Violation Fees</u>

59. Many of Progress's rental homes are located in Homeowners Associations ("HOAs"). HOAs typically have certain rules and responsibilities for residents that live within the HOA community, usually referred to as "Covenants, Conditions, and Restrictions." If there is a suspected violation of these rules, the

HOA will typically send warnings and/or notices of the alleged violation, a deadline to correct the issue, and fines if the violation is not corrected.

60. Progress's website notes this fee on the "Leasing Fees" page, under a drop-down menu for "Situational Fees," which, if a consumer were to open, states: "If Progress is notified of a violation of HOA Covenants, Conditions, and Restrictions . . . a $45 HOA admin fee will be charged in addition to any fines from the HOA or municipality." Progress also repeats this representation in its leases.

61. Progress fails to disclose, though, that in numerous instances, it ***also*** charges residents a $45 fee for each HOA ***notice*** even if that notice is simply an HOA warning, reminder, or courtesy notice—as opposed to a notice of a violation. For example, one consumer complained: "Today, we were informed that they can change the terms of the lease at will. They have now decided that any notice from the HOA is arbitrarily a violation and charge $45 each time they receive correspondence. ***A notice is not a violation as outlined in the lease***. The lease is clear 'VIOLATION' is $45. A courtesy notice for a weed is a notice. They are redefining on the fly." (emphasis added.)

<u>Late Fees</u>

62. Progress's leases typically include a provision assessing late fees (usually $125 to $150) for late rental payments charged each month for as long as

the payment due is outstanding.

63. Under a typical lease, Progress defines "Rent" to include not just the monthly rental price, but also any other charges a resident owes under the lease, including fees or maintenance or repair charges assessed to the resident. Progress's leases also provide for a "priority of payments," meaning that any payment made by a resident is first allocated to fees, maintenance, or other assessed charges (including incorrect and disputed fees or charges) before being applied to monthly rent.

64. In numerous instances, Progress injures consumers by levying late fees against residents for improper charges, including billing account errors that result in erroneous charges assessed to residents. And in numerous instances, Progress injures consumers by levying late fees for failure to pay for repairs that are Progress's responsibility.

65. When residents try to contact someone at Progress to inquire about or dispute an improper fee or charge, they are often unable to reach anyone with authority to remove the incorrect charge, or they do not receive any response, making it difficult for consumers to avoid or correct the fee or charge. Even when Progress admits a fee or charge is incorrect, unless and until it is removed from a resident's account ledger, residents must still pay the disputed fee or charge before they can pay their monthly rent or else be charged late fees. When confronted with

Progress's delayed and broken customer service, residents are forced to decide between paying the improper fees and charges when rent is due, while they wait or hope for these charges to be refunded later, or disputing the improper fees or charges and incurring significant late fees, while also risking possible eviction proceedings as they continue disputing the charges.

**Progress and Pretium Know that Their Falsely Advertised Rental Prices and Hidden Fees Deceive and Harm Consumers**

66. Despite knowing the total monthly rental price, inclusive of all mandatory monthly fees associated with a home before it advertises that home for rent, Progress excludes the mandatory fees from its advertised "Per Month" price. A July 2024 internal slide deck titled "Fee Optimization Update," for example, organized all of Progress's fees into four "lease charge categories." One of the "lease charge categories" was "mandatory monthly charges tied to home DNA that could be rolled into rent including smart home, pool fees, utility provider service fees, septic fees, and broadband fees." None of these "mandatory monthly charges" are "rolled into" the advertised "Per Month" price.

67. Subsequent revisions to Progress's home listing page itemizing some fees and showing an "est. total monthly price" still failed to show all mandatory monthly fees. And Progress knew it: In June 2024, Progress's Manager of IT Product Management emailed the SVP of Revenue Operations and the Manager of Revenue Operations, remarking "Notable callout . . . now RentProgress.com lists

base rent + fees, however, *the list of fees we're displaying is incomplete*." (emphasis added).

68. And Progress and Pretium continued engaging in this conduct out of concern that itemizing fee costs would put them at a competitive disadvantage relative to other large single-family rental companies. In an email exchange about adding fee disclosures on Progress's website, Progress's SVP of Revenue Operations asked: "Have people checked if our peers are doing this? Supportive since we have to move in this direction. [Pretium's CEO] just didn't want to get caught doing it before everyone else did." But because Progress still prominently advertised a monthly rental price that did not include any mandatory monthly fees, the Manager of Revenue Operations "d[id]n't foresee a demand downfall." In other words, Progress did not anticipate a reduction in consumer demand because consumers' focus would be on the prominently advertised monthly rental price, not any purported fee disclosures Progress made.

Progress and Pretium Know that Consumers are Deceived by Progress's Rent Price and Hidden Fees

69. Internal communications, as well as numerous reports, show that Progress and Pretium know their rental prices and fees lack transparency and confuse consumers.

70. For example, since at least 2020, Progress has tracked consumer complaints in monthly survey reports entitled "Voice of Customer," which are

widely distributed throughout the company, including to senior management and executives of both Progress and Pretium. "Charges/Fees/Billing" is routinely listed in the top five most complained about issues and in the top five reasons residents move out.

71. In December 2021, the Better Business Bureau also informed Progress about a "pattern of complaints" that consumers "are often not aware of applied charges and fees to their account" and that Progress failed to provide timely refunds of denied applicants' holding fees.

72. In a March 2022 internal review of Progress's home listing pages, a Progress employee noted that the lease administration fee and renter's insurance exemption fee, among other fees, were not disclosed in the listings: "'***Hidden fees***' are not listed on [these pages], such as [lease] admin fee (currently charge up front at $125), [renter's] insurance waiver [exemption] fee $15.00, $35 credit card convenience fee, and pet fees $35.00." (emphasis added.)

73. An April 2022 internal Progress "Product Management & Marketing" report further noted: "PR [Progress Residential] Investors are concerned with Resident weariness of multiple add on fees 'hidden' in our rental agreement and leasing process." A July 2023 internal Progress report circulated to numerous Progress executives, including the CEO, Co-Presidents, and CFO, similarly found: "There are additional costs besides rent which is associated to renting a home with

Progress Residential. *Currently, we lack transparency in our application process regarding the additional monthly costs including Rentable items and taxes*." (emphasis added).

74. In September 2022, Progress conducted an extensive review of its billing process, again uncovering that **"Fees** are the #1 topic, by far, regarding [resident account] ledger questions" and that "[f]ees are mainly mentioned in the fine-print on the FAQ page of Progress's website." The report concluded that Progress misrepresented the monthly rental price and hid fees, noting that "[r]esidents are calling due to questions about fees that may or may not have been disclosed on the cost sheet," that "tenants are being charged more than the agreed-upon amount for rent," and that "tenants are being charged for things that should be included in their rent."

75. And in 2023, the "Executive Escalations"—a Progress report in which consumers reach out directly to Progress's and Pretium's executives and the press with complaints—stated that consumers have been reaching out to both Progress and Pretium executives about "4 main issues," including "[p]ayments and charges on their ledger."

76. Many consumers have complained about the hidden fees Progress tacks onto their rent. Consumers have complained directly to Progress and submitted complaints to the BBB and law enforcement agencies, both of which

Progress monitors. A sample of these types of complaints includes:

a. "Progress Residential Rental Agency is adding undisclosed fees to cost sheets upon lease initiation. When contacting the company, they explain that the fees are mentioned on their website however, one would need to know to search the site to uncover information about hidden fees. This is causing tenants additional fees to cover month to month charges once the hidden fees are revealed and tenants realize that the cost is much greater than initially advertised."

b. "Progress Residential Homes uses the same illegal tactics, fees, etc. as Invitation Homes and should be investigated also…Smart Home fees that are mandatory, rent advertised does not include hidden fees….[sic] etc."

c. "The amount of money required each month for rent fees changed from the listings on the internet and in the cost sheet after paying the application fees… [The] smart home features were listed as a benefit of service their rental homes. But they are now adding rental fees for smart home services of 17 dollars per month."

<u>Progress and Pretium Know that Consumers are Deceived by and Unfairly Charged Progress's One-Time and Situational Fees</u>

77. Progress's internal research and analyses have also found fault with

multiple one-time and situational fees. For example, a 2023 internal analysis on Progress's holding fee problems noted that the "vast majority" of customer complaints regarding holding fees focused on two topics: (1) "[d]enied applicants who are upset that they have not received a refund of their holding fee," which Progress noted was "the most common issue experienced related to Holding Fees"; and (2) denied applicants who faced a rapid denial of their application yet faced a long waiting period for a refund. The internal analysis even cited consumer complaints, including one that stated: "Don't even bother. I've been waiting for my holding fee refund for 2-3 months and still haven't gotten it . . . I'm starting to think it's just all one big scam company at this point considering they cannot seem to issue a simple refund correctly."

78. Several reports to Progress executives show that Progress also knows consumers are confused about the company's renter's insurance requirement and the renter's insurance exemption fee, and that the company knows it is improperly charging this fee to numerous residents who provide proof of renter's insurance coverage. According to the company's internal research, between 43% and 50% of its residents do not have renter's insurance or do not provide proof of renter's insurance. In late 2022, a public relations company working with Progress found "[t]here is likely confusion that because they [renters] are charged a fee, they believe they carry the insurance [because] the fee and average cost of the insurance

are roughly the same."

79. According to its internal analysis, Progress admitted that the third-party tool it uses to verify residents' proof of renter's insurance "frequently will upload [i.e., charge] insurance waiver fees on [resident] accounts that have provided proof of insurance." This is consistent with the numerous complaints from residents that they have been improperly charged the renter's insurance exemption fee despite providing proof of renter's insurance. As one consumer complained: "I also continue to be billed for rental insurance, despite having had my own active policy in place. I have submitted proof of my insurance multiple times and recently received confirmation from Progress Residential that my verification was received. However, I am still being charged." Yet when consumers dispute the improper fee, Progress and its third-party agent blame each other, leaving consumers with no recourse.

80. Progress's research additionally found that the HOA violation fee was one of the most frequently disputed fees by its residents. Those disputes usually occurred because Progress erroneously charged consumers the fee for non-violation notices. In fact, a Progress employee explained that Progress's own system is *designed* to improperly charge this fee: "[E]ach notice we receive from the HOA is entered into our system as a violation," including a "courtesy notice," "friendly reminder," or warnings that do not constitute violations. As one

consumer complained, "They forward emails the HOA sends out and charge you $45 per email for a simple click of the mouse."

81. Even Progress's own employees did not understand when residents would incur an HOA violation fee. One employee, for example, expressed confusion about why a resident was charged the fee, asking, "I thought, with HOA violations, they [residents] wouldn't get charged as long as it was fixed . . . I'm not fully understanding, so I am sure our resident didn't understand either."

82. Progress executives discussed these same problems with their HOA violation fee and renter's insurance exemption fee practices. In August 2022, a consumer emailed Progress executives directly about multiple issues, including both the HOA violation fee and renter's insurance exemption fee being improperly charged. The consumer described how she was being charged $45 for non-violations that were merely "friendly reminders" from the HOA, and also how she was continually charged a $14.95 fee each month despite having renter's insurance throughout her tenancy. One executive highlighted these sections of the consumer's complaint in bold colors and forwarded it on to other Progress executives, and remarked: "If I were this person, I'd be really mad[] to be getting hit [with] $45 [for] a 'friendly reminder' . . . . Seems like we don't differentiate between 'Friendly Reminder' and 'Violation.'"

83. Progress is aware that its policies, hidden fees, billing account errors,

and inadequate customer service result in deceptive and unfair late fees charged to consumers. The September 2022 billing process review found Progress's numerous errors resulted in improper late fees, including that residents were being "double-billed for things like utilities and rent," "charged late fees even though their rent was paid on time," "charged late fees for an incorrect balance," and "not receiving responses to their requests for refunds or for information about charges on their accounts."

84. In fact, the review found that there were approximately 624 unresolved late fee inquiries created every single month, and "incorrect billing" accounted for 32% of those inquiries. For example, in many of those inquiries, residents pay in advance of the rent due date and have a credit on their account, but the "credit was not applied due to a system error and resident was charged a late fee." (underline in original). At the time of the review, Progress knew of over 2,200 residents who had been incorrectly charged almost $336,000 in late fees.

85. Progress's billing problems are so pervasive that a 2023 internal report on "resident insights" found that "[e]xisting billing processes can cause confusion with residents resulting in late fees that over 30% of the time are manually refunded." Notwithstanding the high percentage of late fees that are manually refunded, numerous residents do not have their improperly charged late fees removed or are forced to pay them to avoid more serious consequences,

including eviction proceedings.

86. As one complaint cited in Progress's 2022 review summarized: "Our account balance is never correct. There are always duplicate charges that lead to a higher balance than what is owed. If we do not pay these BS charges, there's a late fee." Indeed, Progress's employees have recognized the same issue, emailing, for example, that "The resident is now requesting that late fees that occurred as a result of these reversed charges also be removed from her account."

87. Consumers have also repeatedly complained about Progress's myriad of one-time and situational fees:

a. "Was denied for no reasoning and never received our holding fee back. It has now been 4 months and I have called at least 20 times! I don't know who is running this scam but I need my money!"

b. "Do not pay the $500 holding fee for a house that's not available now. My experience is that I paid the holding fee for a coming soon house with an availability of 4/21. Then, as the date approached, the date kept getting pushed out. That was not okay in my circumstance of having to give a 60 day notice to the current place I live . . . I ended up having to secure a place to live through another route and lost the $500 holding fee."

c. "I also continue to be billed for rental insurance, despite having

had my own active policy in place. I have submitted proof of my insurance multiple times and recently received confirmation from Progress Residential that my verification was received. However, I am still being charged."

d. "I have been making payments to the account on time and the company keeps adding late fees and miscellaneous fees."

**Progress and Pretium Rejected Proposals to Truthfully and Clearly Represent Home Prices and Fees to Consumers in Order to Increase Fee Revenue**

88. Progress and Pretium have rejected proposals to disclose the true total monthly rental price and their multiple one-time and situational fees to consumers. For example, in August and September 2021, Progress and Pretium had multiple meetings strategizing their fees roadmap. Phase 1 of that roadmap, entitled "Improve Disclosures," included multiple steps to inform consumers of Progress's fees, such as providing the cost sheet earlier in the application process or changing the home listings' fee language to clearly state that additional monthly fees were required in addition to the advertised rent. Another proposal was to include all required services and fees in the advertised "base rent."

89. Progress and Pretium have not implemented any of these proposals. Rather, as one Progress executive stated to another: "[W]e need fee transparency but we do not want to syndicate [the] bundled price." In other words, Progress refused to include all mandatory monthly fees because it knew that consumer

demand is driven by the prominently advertised total monthly rental price, and consumers would overlook or disregard any purported fee disclosures.

90. In December 2022, Progress considered a proposal to eliminate the renter's insurance exemption fee and instead give its residents a "seamless process" to purchase renter's insurance directly through Progress, which would "provide the resident value." In an internal report, Progress admitted that "[r]esidents are paying a penalty for not having rental coverage that provides them with zero value." But Progress never provided this renter's insurance option to consumers to avoid taking a hit on revenue. Progress's own analysis calculated that if it provided a renter's insurance option to its residents instead of charging the exemption fee, "we estimate ~$6MM hit per year in direct ancillary revenue."

91. These refusals even made their way to the top of the company. In April 2023, after learning that Progress generated over $900K in revenue in holding fees in 2022 and the first part of 2023—a large percentage of which should have been refunded—Progress's then-CEO told the company's CFO that Progress would not fix its holding fee refund process until it could replace the lost revenue, explaining that "…I am not taking $1M impact to do the right thing."

**Progress's and Pretium's Deceptive and Unfair Fees Practices Have Caused Millions of Dollars in Harm to Consumers**

92. An internal Progress report on fees from late 2021 found that

recurring fees added an average of $70/month to the total average monthly amount charged to residents, while non-recurring (one-time and situational) fees added an average of $73/month. These recurring and non-recurring fees added an average of $1,716 over the course of a one-year lease. Since at least 2021, Progress has regularly tracked how much income it earns from fees. A 2023 internal report circulated to Progress and Pretium executives showed that the companies took in $68.8 million in fees and what Progress refers to as penalties (*e.g.*, early termination fees, insufficient notice fees, and HOA violation fees), in 2022, while smart home fees added an additional $6.9 million in revenue. The same report forecast fees and penalties to amount to $101 million in 2023, representing tens of millions of dollars in harm to consumers.

93. Progress's fees have only increased the burden on its residents over the years. In late 2023, another internal report on fee revenue demonstrated how Progress levies numerous fees and charges against applicants and residents far beyond the advertised rent. In the report, Progress showed the "resident journey" from move-in to move-out for a resident with one pet and no defaults or violations: while the resident pays $2,000/month in rent based on the advertised price, that same resident *additionally* pays $775 in move in fees, $1,277 in fees during the

lease, and $80 in utility fees (not related to consumption) (see Figure 6 below).[2]

**Figure 6.**




(Call-out box in the original.)

94. As shown in Figure 6, each step of the "resident journey" includes multiple fees that add hundreds and even thousands of dollars beyond the rent consumers see advertised and expect to pay.

95. Defendants continued to engage in their false and deceptive pricing practices because, as Progress's Vice President overseeing fees noted, one of the

[2] As Figure 6 shows, the "resident journey" also includes $525 in move-out related charges. As discussed in more detail in the "Deceptive and Unfair Security Deposit Practices" section below, a large percentage of residents' move-out related charges are improper.

"pros of RBP [$15/month Resident Benefit Package][3]" fee is that it is "100% profit. The current benefits included have no incremental/additional costs." In other words, by excluding mandatory monthly fees from the advertised monthly rental price, Defendants can charge consumers more than they could than if they included the fees in the advertised rent.

96. The harm to consumers is real: Between 2022 and 2025, Progress took in tens of millions of dollars in monthly recurring fees and one-time and situational fees. And the impact on consumers and the home rental marketplace is significant even beyond the tens of millions in hidden and improper fees. Renters also spend money and time applying to Progress listings, reserving homes, and relocating their families, only to learn that their monthly payment and total monthly rental price is higher than advertised and often exceeds their rental budget.

97. Even Progress executives acknowledged how burdensome these add-on fees were to consumers. In 2024, while discussing Progress's various fees and penalties initiatives, one Progress executive messaged another: "I just [] don't know how much more money there is out there to bill residents."

98. At all times relevant to this Complaint, Progress acted as an agent of Pretium and acted within the scope of Progress's authority with respect to the

[3] As explained in Paragraph 29 above, the Resident Benefit Package fee is one of the mandatory monthly fees that Progress excludes from the advertised monthly rental price.

deceptive and unfair pricing and fees acts and practices. Additionally, Pretium had knowledge of Progress's deceptive and unfair pricing and fees acts and practices, and Pretium participated in or had control over these acts and practices.

## II. Progress's False and Deceptive Claims of Move-In Ready and Inspected Homes

99. For years, Progress has advertised that its homes are "move-in ready" and have been inspected before move-in to ensure their readiness. As explained in more detail below, these claims are false and unsubstantiated.

### Progress Advertises that Its Homes Are Move-in Ready and Inspected

100. Progress claims that its homes are move-in ready and inspected throughout its website. On one page about touring homes, it states, "At Progress, we make things easy. Our move-in ready homes are available to tour on your schedule, any day of the week during operating hours." On another page next to the heading "Clean, safe & functional homes," Progress states that "[e]very Progress home goes through a process to be 'move-in ready,' which means that it will be clean and safe and all major systems will be functional on the day you move in." Progress further represents in its FAQs page that "we carefully prepare each home before you move in," and that "our team does a thorough assessment and upkeep of all of the home's systems to make sure they're in good working order."

101. Additionally, the search results pages and individual home listings on

Progress's website typically display banners advertising homes as "Move-in Ready," and the listings also advertise the home's current status as "Move-in Ready," as shown in Figures 7 and 8 below:

**Figure 7.**




**Figure 8.**




(Red circles and arrow added).

**Progress's Claims that Its Homes Are Move-in Ready and Inspected Are False and Unsubstantiated**

102. Progress has not substantiated its claim that it completes an inspection of each home before a new resident moves in.

103. Furthermore, in numerous instances, Progress's representations that their homes are move-in ready are false and are instead in need of immediate or serious maintenance, repairs, or cleaning.

104. Progress is aware that many of its homes are not move-in ready when a resident moves in, and it uses metrics to regularly track this issue. In particular,

Progress tracks "F30 work orders," which are maintenance requests submitted by residents within the first thirty days of moving into their homes.

105. Internal Progress reports show that many residents have submitted these "F30" work orders for exactly the kind of safety, habitability, and functionality issues that Progress represents do not exist at the time of move-in. A 2024 report circulated to Progress and Pretium executives found that between 2019 and 2024, an average of approximately 30% of move-ins had at least three work orders within the first thirty days of moving in, and an average of approximately 10% of move-ins had over five work orders within the first thirty days. Most of these work orders were for serious maintenance and repair issues: The report noted that the top five categories of "F30" work orders—which made up nearly two-thirds of all F30 work orders—were related to plumbing, appliances, doors or windows, electrical, and HVAC. The report also described these top five categories as "mechanical or functional, suggesting these issues are not typically 'cosmetic' in nature or related to 'as is' discrepancy." Progress itself notes in internal reports that "[f]irst 30 day work orders (F30) is a solid indicator of quality of turn[4] and renovation via resident feedback."

106. Further exacerbating the problem, Progress has a practice of

[4] A "turn" is the process of readying a home between move-out and move-in.

purposefully ignoring or canceling some "F30" work order requests made by new residents. According to the same 2024 report, Progress states: "We historically push back/cancel some WO [work order] requests in the first 30 as part of an 'as-is' expectation setting with residents."

107. Progress also has a policy of using Photoshop to advertise and present its homes so they appear move-in ready. In its 2024 Leasing and Marketing Manual, under the section on "Photo Standards," Progress includes instructions for photography vendors, including that vendors are to email Progress's marketing assistant "[i]f any of the following conditions exist that cannot be remedied in Photoshop," including a "[m]essy interior," "[o]vergrown or completely dead landscaping; completely dead/dirt lawn," "[o]bvious construction/improvements in progress," and "[o]bvious dirt (walls, carpet, roof, yard, etc.)."

108. Progress even instructs its employees to Photoshop appliances into photos of a home if certain appliances are not available in a supposedly "move-in ready" home. In Progress's Market Business Operations and Renovation Guidelines, under the section "Timely delivery of renovated homes," it states that "[a]ppliance delays should not hold up readying a home when possible," and that "[a]ppliances can be photo shopped into marketing photo."

109. Progress does not disclose to consumers that the photos in its advertised listings have been Photoshopped. One consumer complained: "When I

arrived at the house, it was uninhabitable. The photos on the listing completely misrepresent the house as clean and move in ready. Instead what I found were drawing on the walls, undisclosed water damage throughout the home . . . ."

110. Progress executives have expressed concern that many homes are not move-in ready and that the problem has persisted for years. In late 2022, after one executive noted that residents were "experiencing a higher frequency of work orders" at the time of move-in, another executive responded, "So basically everything we've been calling out for the last 6-8 months is getting worse." And in 2024, when reviewing aggregate data on F30 work orders, the Senior VP of Strategy and Operations stated, "I think most concerning is that 30% of move-ins have 3+ work orders," and that this 30% figure "is not very materially different from the last six years (24-28%, excluding COVID which is probably suppressed from doing limited work orders in early Covid)." He added that "[t]he most common categories [of F30 work orders] are all of the most expensive items (replacing appliances, HVAC work, plumbing work)." Around the same time, he emailed other executives about F30 work orders in June 2024 alone, reporting that nearly 85% of these work orders related to "Non-Cosmetic" issues—and of those work orders, "[w]e attribute 25% of these to something that was clearly a miss on the turn."

111. In addition, Progress's own research and customer surveys show that

a significant percentage of residents believed their home was not move-in ready. A May 2022 report prepared by the former SVP of Marketing and shared with Pretium contained a slide titled "Where we are not delivering on our promise" (emphasis in original), listing several undelivered promises. At the top of the list was "Quality of Homes," followed by "renovations are not consistent, rise in cleanliness & maintenance complaints upon move-in." The report also noted that 35% of surveyed residents responded that their home "was not in move-in ready condition," and that "57% of move-ins YTD [year-to-date] were dissatisfied with the quality of their homes due to cleanliness and maintenance issues."

112. Numerous Progress consumers have complained about the serious maintenance, repair, and safety-related issues they confronted when moving into their homes, including submitting complaints to the BBB and posting reviews online, both of which Defendants monitor. For example:

a. "I moved in with heavy carpet stains, heavy urine smell on one of the carpets, roach infestation, heavy ceiling leak when one of the showers were turned on so we could not use it. Was told by Progress that it isn't an emergency since I had another shower to use. . . . Mind you this was advertised as a move in ready home."

b. "When we first moved in I immediately had to put in a work order request for a deck that did not have a railing [and] a toilet the [sic]

flooded the main bathroom . . . Also when we moved in we did not have Air [sic] conditioning for 4 days. I have 2 small children and this home was unfit to live in."

c. "I moved into my rental home December 2022, [and] I immediately found a strong cat urine scent, the refrigerator not working properly, the dishwasher not working, the garbage disposal stuck, and the garage door not functioning correctly. . . . The entire house reeks and is uninhabitable."

d. "[A]t the time of viewing the property there [were] no appliances and I had major concerns about them not being there by the time we moved in. . . . On the morning of move in we spoke with move in associate and let him know that there were still no appliances. . . . We have 5 children . . . ."

113. At the same time, Progress knows how critical it is for consumers to be able to move into a home on the date promised. In fact, an internal "Customer Experience" report from January 2024 described at least 129 instances in 2023 when newly signed-up residents who had moved from across town or across the country "arrive[d] to a Progress home and ha[d] nowhere to sleep that day" because the home was not ready on time. The report notes that consumers have "paid thousands of dollars in one of the top 3 most expensive life events in the

country," and yet Progress failed to alert any of them that they could not enter their new home when they arrived or offer alternative living arrangements. In other words, Progress recognizes the enormous moving costs incurred by consumers to move into one of its homes, and despite its representations that the homes will be move-in ready, Progress fails to provide move-in ready homes in numerous instances.

114. Despite being presented with a suite of data and complaints demonstrating that its homes are routinely not move-in ready, Progress continues to falsely represent to consumers that its homes are move-in ready and that it inspects each home before residents move in.

115. At all times relevant to this Complaint, Progress acted as an agent of Pretium and acted within the scope of Progress's authority with respect to the deceptive acts and practices regarding the move-in and inspected condition of homes. Additionally, Pretium had knowledge of Progress's deceptive acts and practices regarding the move-in and inspected condition of homes, and Pretium participated in or had control over these acts and practices.

## III. <u>Progress's Deceptive and Unfair Security Deposit Practices</u>

116. Progress promises consumers it will return their security deposits, only deducting for damage that residents cause beyond normal wear and tear. In fact, contrary to its representations, Progress withholds security deposits for

improper reasons, including for normal wear and tear, for pre-existing damage, and for renovations and repairs that are Defendants' responsibility. Progress also operates an unfair move-out and security deposit refund process that is rigged against consumers. And in numerous instances and contrary to its promises, it fails to send consumers move-out statements that itemize deductions against their security deposits.

**Progress Falsely States to Consumers It Will Deduct Security Deposits Only for Damage Beyond Normal Wear and Tear**

117. Before consumers move in, Progress requires them to pay security deposits as high as twice the monthly rent, meaning security deposits can easily exceed $4,000 for many residents. Progress knows how important security deposit refunds are to consumers, stating on its website, "We know your security deposit is important to you, and we will process it as quickly as possible" and instructing consumers on how to "maximiz[e] your security deposit refund."

118. As part of these representations, Progress also tells consumers in multiple places that it will only withhold their security deposits for damage consumers cause that exceeds the normal wear and tear of a home. On the "Maximizing your security deposit refund" section of its website, for example, Progress states: "Over the course of your time in the home, normal wear-and-tear is expected, but anything above that will result in repair costs at the end of your lease. In that case, your security deposit helps cover the cost of needed repairs

and/or maintenance." On another page of its website titled "Making Your Move Out Easy!," Progress similarly represents that consumers can maximize their security deposit refund by "leav[ing] the home in 'broom clean' condition," which includes "ensur[ing] the home is free of damage, *aside from normal wear and tear*." (emphasis added).

119. Progress's leases similarly represent that "[a]ny damage or defect of the Premises that was not present at move-in, *'ordinary wear and tear' only excepted*, will be the Resident's responsibility to repair or remediate, and the Landlord will charge the Resident's security deposit accordingly." (emphasis added).

120. These representations are false. The truth is that Progress has an explicit policy of holding consumers responsible for returning homes to their "pre-move in condition"—a standard that, by definition, requires consumers to pay for the normal wear and tear of a home. In fact, Progress regularly withholds consumers' security deposits for normal wear and tear, for damages that existed before consumers moved in, and for renovations and general maintenance.

121. On its webpage, under "Moving Out of a Progress Home," the company describes how consumers should prepare the home before moving out: "Returning the home to its pre-move in condition prevents deductions from your security deposit. If cleaning and repairs are needed or damages have occurred

during your residency, Progress Residential® only charges you for our cost to return the home to its pre-move in condition." This requirement contradicts Progress's own representations.[5]

122. For consumers, Progress's deceptive practice of withholding their security deposits for normal wear and tear, for preexisting damages, and for renovations or maintenance that are Progress's responsibility causes serious financial hardship. Here are examples of common consumer complaints:

a. "Upon moving out, I was charged $750 for wall scuffs, despite Georgia Code 44-7-34 (2018) which prohibits retaining deposits for normal wear and tear. . . . I had the home professionally cleaned and provided a receipt, yet was charged $450 for not meeting their standards. This pattern of inflating charges to withhold security deposits appears to be a deliberate exploitation of tenants to cover preparation costs for new tenants."

b. "We told a representative when we moved in that their [sic] were several areas of the house that the paint was chipped or very sloppy. We were told not to worry about the paint as that was normal wear and tear and we could not be charged for that. When

[5] This requirement also violates state laws that hold landlords responsible for normal wear and tear.

we moved out . . . [w]e were changed [sic] $1000 for the paint that we were told was normal wear and tear."

c. "Before we moved, I had an entire week off and during that time we made sure every corner of the house was spotless, ever[y] nail hole was repaired. . . . The last thing we did before stepping out was to hire a professional carpet cleaner for $330 and leave the receipt on the counter. Upon inspecting the house, they decided to deduct $950 for 'carpet cleaning' and $500 for 'scuff marks in the living room' with no proof of this damage or that they actually spent this amount on fixing these fake issues."

123. Progress knows that its practice of improperly withholding security deposits has caused widespread hardship and confusion for consumers. For example, in July 2024, Progress executives circulated a document entitled "Security Deposit Improvements," which flagged multiple problems with Progress's handling of security deposits, including:

> Final resident balances are causing an overabundance of legal disputes and escalations. **Scopes**[6] **may contain an excessive amount of charges that would often be considered wear and tear, <u>and should not have been placed on the scope</u>**. Scopes with a higher than necessary volume of questionable charges are causing

[6] A "scope" refers to the "scope of work," which is a list compiled by Progress employees that includes the items for update, repair, or cleaning to make a home ready for the next tenant, as well as a determination of which items the tenant is financially responsible for.

delays in the deposit accounting process, and accounts are not being processed effectively. (emphasis added.)

124. In reviewing this "Security Deposit Improvements" document, Progress's CFO messaged the Chief Accounting Officer, stating: "[A]ll the noise is that we are slow and we get it wrong and we don't give money back . . . so, can you think about how to address those questions[?]" (ellipses in original.)

125. In August 2024, Progress held a multi-day workshop examining its move-out and security deposit deduction processes. Following the workshop, Progress employees presented their findings that the "move-out process is fraught with defects," that move-out charges are disputed about 35% of the time, and that there are "**no defensible standards / transparency on what and when we should charge a resident['s security deposit]**"—to senior management, who then shared the presentation with Pretium executives. (emphasis added.) The presentation further found that "No Clear / Defensible Standards" resulted in "[u]nnecessary rework."[7] In the list of possible solutions to these issues, the presentation recommended: "Implement 'fool proof' resident responsible charges that do not 'nickel and dime' our residents and that take owner responsibility into account."

126. Moreover, Progress and Pretium have kept track of the incoming

---

[7] The presentation also found Progress imposed "[n]oncompliant charges not reflective of state regulations," such as deductions that do not comply with state laws prohibiting charges for normal wear and tear.

consumer complaints about security deposit charges. In one executive slide deck dated February 2023, Progress analyzed "executive escalations," a subset of consumer complaints sent directly to Progress's and Pretium's executives and the press, and noted that "[c]ustomers are reaching out [] about 4 main issues," one of which was "[d]eposit refunds." And in the 2024 move-out presentation referenced above and shared with Pretium executives, Progress reported that there were approximately "2,500 move-out related disputes each month" and "[m]ore than 100 lawsuits filed each year, including class action [lawsuits]" regarding security deposits.

127. Progress's security deposit practices are outside the industry norm: Progress refunds far less of its residents' security deposits when compared to other landlords across the country. According to a 2024 survey of over 36,000 renters nationwide, approximately 44% of renters reported receiving their entire security deposit after move-out, whereas only 17% of Progress renters received 95-100% of their security deposit during the same time period. Conversely, the survey found that approximately 26% of renters received none of their security deposit, whereas nearly 43% of Progress renters received 0–5% of their security deposit.

**Progress Unfairly Deducts Costs From Consumers' Security Deposits**

128. When it comes to its security deposits, Progress employs a classic "hold-up" strategy: Progress secured its tenants' security deposits on the promise

that it would only use the deposits for damages that went beyond ordinary wear and tear.[8] Months or years after entering into the agreement with the tenants, Progress's security deposit practices take advantage of the tenants' sunk costs (*i.e.*, the security deposit and deadline to move) by opportunistically leveraging the terms of the agreement in its favor and extracting money from the tenants. As Judge Posner observed in another context, Progress's conduct is best understood to reflect "the situation in which one person obtains a temporary monopoly that it tries to use to obtain a benefit to which it is not entitled." *Professional Serv. Network, Inc. v. Am. Alliance Holding Co.*, 238 F.3d 897, 900 (7th Cir. 2001).

129. Progress's 2024 move-out presentation highlighted many of its pernicious security deposit refund tactics: After a resident moves out, a Progress employee walks through the home and uses "common sense and subjective criteria to charge cleaning or label damage as resident responsible." Even if the employee tries to apply objective criteria, "[t]here are no before-after artifacts[, i.e., photos or other documentation of a home's condition,] for [an employee] to determine what changed since move-in," meaning the employee cannot reliably determine what damage existed at the time a resident moved in versus what damage occurred during their tenancy. Thus, the "[l]ack of move-in photos results in no foundation

---

[8] *See, e.g.*, B. Klein, *Why Hold-Ups Occur: The Self-Enforcing Range of Contractual Relationships*, 34 Econ. Inquiry 444 (Jul. 1996).

for charges." After the employee walkthrough, Progress's *offshore* security deposit accounting team—which never sets foot in the home—reviews the charges and makes adjustments for resident-responsible charges before generating the move-out statement. These offshore teams "have little context/guidance in which to assess resident responsible items." (emphasis in original.)

130. Progress's security deposit practices allow it to extract hundreds or even thousands of dollars from consumers for things they are not responsible for, including normal wear and tear to a home. In addition to normal wear and tear, Progress also charges consumers for damages that existed before consumers move in and for renovations and repairs that are Defendants' responsibility.

131. Progress's senior leadership has for years known about its systematic practice of unlawfully extracting money from consumers' security deposits. In May 2023, a Senior Director emailed Progress's CEO, Co-President, and other executive leaders about this exact issue, opining:

> As I review [the] volume of move out disputes, I have been reaching out across multiple leaders to understand ***what our "standards" or any document delineating normal wear and tear is and have learned we do not have one***. ***We also don't differentiate between 1 year vs. 4 year normal wear and tear***. There is a "walk out" inspection process but the feedback I received is that it depends on who does the walk out inspection.
>
> I have also learned that there are at least three different departments and processes involved in deciding the final amount the resident receives from their deposit upon move out.
>
> I believe there is a way to clean this process up and reduce move out

> complaints and the tone around ***"Progress will take your deposit no matter what[."] Our residents definitely approach their move out time anxious as to what will happen to their deposit.*** (emphasis added.)

In response, one of Progress's Co-Presidents agreed, stating: "It's not standardized. There is a lot to unpack here . . . ."

132. In September 2023, a report to Progress executives described various "Issues & Opportunities" with the security deposit process, including: "Damages are being charged that are not resident responsible" and "Scope charge consistency and approval on market level."

133. In July 2024, Progress's senior leadership team discussed the same types of defects in a "Security Deposit Improvements" report, including: "[m]issing photos and information on scopes," "[u]nnecessary volume of non 'resident responsible' charges to review," and "[s]everal departments, markets, and legal teams lack the access and visibility needed to make accurate assessments on scopes and damages." One executive told another that the report explained the need for "scope teams to be better trained by their leadership" to account for wear and tear and include accurate resident responsible charges, explaining, "I'm sure we would see a reduction in [security deposit dispute] cases if the charges are more accurate." In response, the executive succinctly summarized, "[A]ll the noise is that we are slow and we get it wrong and we don't give money back."

134. Among the numerous consumer complaints about Progress's security

deposit charges, many consumers have highlighted the company's unlawful security deposit practices that led to such charges. Here is one telling example from a consumer: "Progress Residential withheld our entire security deposit of $2,080 and invoiced us an additional $463.35 for repair costs, citing damage to the garage door. . . . When asked for proof, their response was merely that 'the charges are valid,' without providing any supporting documentation. I have attached images from the 2021 MLS listing, with a watermark, that show the preexisting damage. . . . We occupied the residence from May 2022 to May 2024."

135. Progress knows that its move-out process produces "inaccurate, inconsistent, [and] rigid" charges to consumers' security deposits, according to its 2024 move-out presentation. Likewise, it knows that correcting the process would "eliminat[e] unnecessary and improper charges to security deposits." But it has declined to fix the process, and instead continued to generate tens of millions of dollars from improper charges to consumers' security deposits.

**Progress Misrepresents Its Delivery of Move-Out Statements to Consumers**

136. Progress's deceptive and unfair security deposit practices are exacerbated by its failure to send itemized move-out statements as promised. Progress promises to send consumers a statement itemizing any charges or adjustments to their security deposit, along with a refund of their security deposit if they are owed one.

137. The company's webpage "Moving Out of a Progress Home" includes a subsection titled "Issue your Security Deposit Refund," which includes the following language: "Your account will be reconciled to include any credits, adjustments or charges and the security deposit refund or charge statement will be sent within 30 days of your move-out or sooner, depending on the laws of your state." Another Progress webpage titled "Resident Guide" states that, at the end of the lease, Progress shall "[p]rovide final accounting of any unpaid amounts on resident's ledger and damages" and "[r]eturn any unused portions of the security deposit."

138. Progress repeats this promise to consumers before they move out of their homes. The company sends standard emails to consumers about moving out as they approach the end of their lease, stating: "Your account will be reconciled to include any credits, adjustments or charges and the security deposit refund or charge statement will be sent within 2 weeks of your scheduled move out date." This two-week turnaround time for providing move-out statements is even faster than the thirty days that the company promises elsewhere.

139. Yet in practice, in numerous instances, Progress fails to send consumers a move-out statement within thirty days, if at all, and many consumers have complained to the company that they never received itemized move-out statements. As one consumer described it: "I sent a letter to Progress stating I have

not received my security deposit or itemized list. They responded by sending a check that was less than my deposit. However, I have not received the itemized list as of today . . . . Despite this delay, Progress Residential deducted $560.04 from my security deposit."

140. Progress knows that this problem is systemic. In the 2024 internal workshop on move-out issues, which was also shared with Pretium, Progress found that "many residents do not receive move-out statements at all." In fact, according to the company's research (included in the 2024 workshop, and thus shared with Pretium), *less than 35%* of residents receive move-out statements, amounting to thousands of residents who do not receive them. The resulting harm is real: without the benefit of the move-out statement, it is difficult, if not impossible, for these consumers to dispute the large sums of money that Progress frequently withholds from their security deposits.

141. At all times relevant to this Complaint, Progress acted as an agent of Pretium and acted within the scope of Progress's authority with respect to the deceptive and unfair acts and practices regarding security deposits. Additionally, Pretium had knowledge of Progress's deceptive and unfair acts and practices regarding security deposits, and Pretium participated in or had control over these acts and practices.

## IV. Progress's Unfair Customer Service Practices

142. Progress's deceptive and unfair acts and practices as described above are compounded by its inadequate and unlawful customer service. When consumers contact the company about various issues throughout the leasing experience, Progress has a pattern and practice of failing to respond in a timely manner, failing to respond at all, or giving consumers the runaround so that they cannot get their issue resolved.

143. Progress's own research identified major gaps in the company's customer service, finding that at one point the company's "Customer Care" team took 38 minutes on average to answer customers' phone calls, and that the "abandon rate" of phone calls was 49.6%, meaning nearly half of all customer calls were terminated before they reached a customer service agent.[9] Another report on Progress's call center acknowledged several problems leading to its "inconsistent" and "fragmented" customer experience, including "rout[ing] [calls] to other departments and not to outcomes," "[e]xisting policies can cause an **estimated 30% in repeat calls** and drive residents to seek alternative channels for resolution," and "[a]bsence of defined resident goals result in inconsistent, delayed resolution." (emphasis in original).

[9] Although consumers can also reach out to Progress via email, many consumers complain that they do not receive any response from Progress despite sending multiple emails and thus resort to calling the company.

144. Progress is well aware of its inadequate customer service. In late 2021 and early 2022, the Better Business Bureau ("BBB") contacted Progress about a "pattern of complaints," including the company's failure to respond to consumers regarding questionable and unrefunded fees and maintenance and repair concerns. In a 2022 presentation by a consulting firm, the firm found that over half of the resident survey responses indicated that consumers moved out "specifically because of [both customer service and maintenance/repair-type] service issues."

145. Reports to Progress and Pretium executives have also noted that Progress fails to provide consistent or accurate information to its residents, leaving them confused and unsure how to proceed. For example, the consulting firm found that Progress's "inconsistent messaging" led to "diminished trust" by "residents [who] lose confidence in the validity of the information being presented." A 2024 internal report—which was forwarded to Pretium executives—summed it up as "A Broken Customer Experience," displaying an icon with only 1 out of 3 stars for customer experience on that slide. The report further highlighted specific customer experience issues, including: "14 different workstreams to solve an issue" which "work against each other confusing customers and associates," "[n]o indicators that someone is having an issue," "cases can be closed without any action taken or customer interactions," and "[c]ustomers must reach out for [the] reason" that their case was closed.

146. Internal reports further demonstrate Progress's and Pretium's awareness of the numerous customer service complaints as well as the systemic issues that lead to inadequate customer service. In 2022, Progress's "Voice of Customer" report, which summarizes results from resident surveys and complaint tracking, found that "52% of the residents surveyed indicated that they will not renew their lease or are undecided about renewing their lease, citing customer service issues." Progress executives shared the same report with Pretium executives. And an internal Customer Experience report from January 2024 admitted that Progress has a "gap in communication . . . There is not a consistent approach to when we call and how we communicate …When is an outbound call to a resident appropriate? After 5 calls? 10 days with no heat in the winter? When they've submitted 5 cases (work orders)?" Progress's analytics of a three-month snapshot for the fourth quarter of 2023 showed that it took an average of 39 days to process credit requests and 18 days to close out work orders.

147. Progress's insufficient staffing and internal processes have contributed to the problem. In February 2023, Progress admitted that "our turns team [which prepares homes between move-out and move-in] is not designed to

handle high volume and complex projects driven by FrontYard[10] and bulk deals[, i.e., acquisitions of multiple homes at a time].” A February 2023 “Strategic Review” summarized that Progress’s “current Service Operations process is built around **manual tasks that do not scale and cannot be tracked** effectively. In addition, our current, **outdated tech stack**, has made high-quality service at current home counts untenable in some markets.” (emphasis in original). The review found that 40% of over 900,000 service calls (or over 360,000) are status inquiries on existing work orders.

148. In numerous instances, Progress’s inadequate customer service results in residents enduring extended periods of time with unresolved issues—including billing errors and improper charges, homes not being ready for move-in, serious maintenance and repair problems, and security deposit disputes. The company has not taken sufficient steps to remedy its broken customer service, and as a result, consumers are not able to have their issues timely or adequately resolved, significantly harming consumers.

149. One consumer’s experience demonstrates the extent of this harm.

---

[10] In 2021, Pretium and another investment firm acquired Front Yard Residential Corp. (referred to here as “FrontYard”), one of the largest single-family rental companies in the nation. As a result of the merger, thousands of homes were added to Progress’s property management portfolio. However, Progress did not have or devote enough resources—including capital, personnel, infrastructure, or processes—to immediately assume management of thousands of more homes, many of which required significant repairs and renovations.

After submitting over twenty work orders to Progress for recurring HVAC, lighting, and appliance issues, all without resolution, the consumer recounted:

> This failure to follow through has affected my quality of life and led to excessive utility costs due to faulty systems. The most critical ongoing issue began in October 2024 when the heat stopped working. Over six months, through both freezing and extreme heat, I've endured unlivable conditions while paying over $600/month in electric bills. Despite multiple repair attempts, nothing was resolved in timely fashion. My reimbursement requests have gone unanswered. I've spent countless hours on the phone, facing long hold times, repeating my concerns to different agents, only to receive no accountability or resolution. Progress's customer service and maintenance support are exhausting, inefficient, and neglectful, especially when it comes to livability issues.

150. At all times relevant to this Complaint, Progress acted as an agent of Pretium and acted within the scope of Progress's authority with respect to the unfair customer service acts and practices. Additionally, Pretium had knowledge of Progress's unfair customer service acts and practices, and Pretium participated in or had control over these acts and practices.

## V. <u>**Progress Has Used Provisions in Form Contracts to Censor Negative Reviews**</u>

151. In the course of renting homes, Progress has offered and entered into numerous form contracts with consumers that contain "non-disparagement" provisions that prohibit consumers from making any statements or communications that could disparage Progress, thereby restricting consumers' ability to communicate their honest reviews or assessments of the company.

152. Progress has offered and entered into different types of these form contracts with consumers at different times throughout the rental process, including in Account Adjustment Agreements, Early Termination Agreements, and Relocation Assistance Agreements.

153. **Account Adjustment Agreements**: When consumers complain about incorrect or improper charges or customer service issues, in many instances, Progress agrees to credit or refund some amount of money to the consumer to resolve the matter, but often only if they sign Progress's form Account Adjustment Agreement. In many instances, the Account Adjustment Agreement contains the following "Non-Disparagement" provision:

**Figure 9.**

4. **Non-Disparagement**. The Residents for themselves, their heirs, executors, representatives, successors and/or assignors, further understand and agree that they will not disparage or attempt to injure the reputation of Landlord in any manner, including all forms of social media, or make negative comments or remarks about Landlord to third parties, regardless of the truth or accuracy of such remarks and regardless of whether such remarks relate in any way to the allegations.

154. A copy of the Account Adjustment Agreement (with the consumer's personal information redacted) that includes this language is attached as Exhibit A.

155. From at least September 2022 through July 2024, Progress offered and executed Account Adjustment Agreements with consumers that included the non-disparagement provision quoted above or a substantially similar version.

156. Progress has offered these agreements to consumers under a variety of

circumstances and at different points during their tenancy. For example, Progress offered an Account Adjustment Agreement to a consumer near the start of their lease, where the company agreed to credit $955.86 to the consumer "due to a two week delay with moving-in associated with work orders." In another instance, Progress offered an Account Adjustment Agreement to a consumer in the middle of their lease, where the company agreed to credit $4,090 to the consumer because of "[s]ervice issues caused by leak" at the home.

157. **Early Termination Agreements**: If a resident chooses to terminate his or her lease early, Progress typically charges an early termination fee equal to two months' rent. In many instances, Progress agrees to waive some or all of the early termination fee, but often only if residents sign Progress's form Early Termination Agreement, which frequently contains the following "Non-Disparagement" provision:

**Figure 10.**

> 15. **Non-Disparagement**. The Parties further understand and agree that they will not disparage or attempt to injure the reputation of another Party to this Agreement in any manner, including all forms of social media, or make negative comments or remarks about them to third parties, regardless of the truth or accuracy of such remarks and regardless of whether such remarks relate in any way to his allegations. The Parties also understand and agree that they will not incite or encourage third parties to file lawsuits, complaints, including those to governmental agencies, or otherwise take action against another Party to this Agreement

158. A copy of the Early Lease Termination Agreement (with the consumer's personal information redacted) that includes this language is attached

as Exhibit B.

159. From at least January 2022 through April 2024, Progress offered and executed Early Lease Termination Agreements with consumers that included the non-disparagement provision quoted above or a substantially similar version.

160. **Relocation Assistance Agreements**: Certain eligible consumers, including those who are behind on their rent payments, request assistance moving out and relocating from a Progress home. In many instances, Progress agrees to pay these consumers a sum of money as "relocation assistance," but only if they sign Progress's form Relocation Assistance Agreement,[11] which frequently contains the following "Non-disparagement" provision:

**Figure 11.**

> 7. **Confidentiality and Non-disparagement.** Resident agrees to refrain from making, directly or through a third party or agent, any written or oral statements, representations or other communications, whether via any form of social media or otherwise, that disparage or may in any way tend to harm or otherwise damage or tarnish the good will, reputation or standing of, or in any manner may tend to cause harm or hindrance to the business or operations of, Landlord, Property Manager or their respective affiliates or any of their respective employees, partners, members, partners, trustees, officers or directors. Resident also agrees not to incite or encourage third parties to file lawsuits, or complaints, including with any governmental agencies, or otherwise take action against Landlord or Property Manager or any of their respective affiliates or the respective employees, partners, members, partners, trustees, officers and/or directors of each of Landlord, Property Manager and such affiliates. Resident agrees not to disclose any information regarding this Agreement, except to Resident's spouse, tax or financial advisor, and/or legal professional with whom Resident chooses to consult regarding Resident's consideration of this Agreement, or as otherwise required by law.

161. A copy of the Relocation Assistance Agreement (with the consumer's personal information redacted) that includes this language is attached as Exhibit C.

162. From at least December 2022 through June 2023, Relocation

---

[11] The company used different names for these agreements, including Hand Up Agreement.

Assistance Agreements executed by Progress and consumers have included the non-disparagement provision quoted above or a substantially similar version.

163. Pretium knows that some of Progress's form contracts have contained this non-disparagement provision. For example, in 2023, a consumer emailed both Progress's and Pretium's general email accounts about multiple issues related to eviction and relocation and attached a copy of the Relocation Assistance Agreement—which contained the non-disparagement provision quoted above.

164. At all times relevant to this Complaint, Progress acted as an agent of Pretium and acted within the scope of Progress's authority with respect to the unlawful acts and practices regarding consumer reviews. Additionally, Pretium had knowledge of Progress's unlawful acts and practices regarding consumer reviews, and Pretium participated in or had control over these acts and practices.

## VI. Defendants Use Their False Representations to Entice Consumers to Hand Over Their Financial Information

165. Defendants use false statements to obtain or attempt to obtain consumers' sensitive personal and financial information.

166. After Defendants make false statements to consumers, Defendants require consumers to provide financial information such as bank account, credit card, or debit card information to apply for and rent one of Defendants' properties and obtain Defendants' Home Rental Services. When consumers apply, Defendants obtain consumers' financial information.

167. At all times relevant to this Complaint, Progress acted as an agent of Pretium and acted within the scope of Progress's authority with respect to the false statements made to consumers to obtain or attempt to obtain their financial information. Additionally, Pretium had knowledge of Progress's false statements made to consumers to obtain or attempt to obtain their financial information, and Pretium participated in or had control over these acts and practices.

## VII. Pretium Is Liable for the Unlawful Acts and Practices Described in this Complaint

168. Pretium describes itself as the owner of the homes that are managed by Progress. On its website, Pretium states that it is "a leading owner and operator of single-family residential homes in the United States." In letters to Progress residents, Pretium has stated, "We are the owner of your rental home." And in presentations to investors, Pretium refers to the renters as "our residents."

169. Pretium describes Progress as "our property manager" and "Pretium's wholly owned property manager," as well as its "vertically-integrated SFR[12] subsidiary."

170. Pretium and Progress are significantly intertwined, and in many ways they treat each other as one and the same. For example, a Pretium internal report states that it has "4,300+ Employees globally"—which includes Progress's

[12] "SFR" is a common acronym for single-family rental.

approximately 3,000 employees—and shows "Pretium's Key Markets" as the 30+ markets where Progress operates. Pretium's website shows the "Leadership" of its Real Estate Equity team to include Progress's two Co-Presidents along with several Pretium executives. A Progress report shows the "Progress Senior Management Team" to include Pretium's CEO and several other Pretium executives. Similarly, a Progress report describes a Co-President of Progress as being part of both companies, stating that he "[j]oined Progress/Pretium >10 Years ago." In a 2023 "Single-Family Rental Peer Comparison" report, Pretium compared its performance to that of its "peers," which included Progress's competitors: American Homes 4 Rent, Invitation Homes, and Tricon. Other Pretium reports describe how Pretium "Built Progress Residential"; state that Progress is "crucial to the success of the Firm; close collaboration is required for continued outperformance"; and state that Pretium's key initiatives include "Partner[ing] with Progress to optimize asset and fund performance."

171. Pretium and Progress executives regularly meet to discuss Progress's operations, and Progress executives routinely prepare reports for Pretium on day-to-day property management updates. For example, Progress's then-CEO presented "Bi-weekly catch up" reports to Pretium's CEO. Progress sends Pretium executives "Weekly Notes" presentations with detailed information on topics including pricing and revenue management, market operations, and marketing and

customer survey updates. Pretium and Progress executives attend weekly and quarterly meetings to discuss the business's performance, such as "[d]eep dives into Gross turn cost, move out to move in timelines," "key drivers of cost/expenses," and "HOA & Other Fees: Unravelling any questions/ complications there."

172. Pretium is also regularly involved in and oversees Progress's property management operations, including budgeting, consumer-facing initiatives, and overall business strategy. For example:

a. In 2022, the Minnesota Attorney General's Office sued both Progress and Pretium for several violations, including failing to repair their homes and causing uninhabitable conditions. When Pretium moved to dismiss for lack of personal jurisdiction, the court denied Pretium's motion (and the appellate court affirmed) based on evidence that Pretium executives communicated directly with residents about repair issues and even traveled to the state to examine the homes and directly address the issues.

b. A 2022 "Weekly Notes" presentation stated that Progress was "[w]orking on [a] framework for resident experience strategy, including roadshow goals and objectives, to build out in partnership with Pretium."

c. A 2023 Progress internal report described how Pretium allocated money to Progress for a public relations firm, stating the need to "[a]lign with Pretium on structure/ownership for PR, GR, Community Relations going forward."

d. A 2024 Pretium presentation described how Progress and Pretium were working together "to build a budget solution that will meaningfully increase the organization's efficiency and effectiveness and provide a solution across BOTH Progress and Pretium needs."

173. It is no surprise, then, that for years Pretium has known of the deceptive and unfair acts and practices alleged herein. For example:

a. From 2022 to 2025, Progress and Pretium executives received numerous emails from consumers describing issues with hidden fees, billing errors, horrible conditions upon move-in, improper security deposit charges, and customer service failures. For example, in 2022, a consumer emailed several Pretium email accounts about her customer service issue because "[i]t is hard to contact anyone in the company to answer questions or address concerns."

b. A 2023 Progress report on "Executive Escalations" stated:

"Customers are reaching out to the [Progress] Executive Team, Pretium, and our Press Inbox about 4 main issues," which are "Payments and charges on their ledger," "Evictions," "Deposit Refunds," and "HVAC and Overall Condition of home."

c. In a 2023 report that Progress executives shared with Pretium, the report stated: "Markets voicing concern over deteriorating performance regarding average Speed to Answer for both Customer Care and Service Coordination," finding that the "20 minute 'speed to answer'" was "[s]till an issue."

d. Progress executives shared a 2023 report with Pretium executives on the results of a resident survey taken three months after residents moved in, noting that "54.1% of residents surveyed in July, stated that Home Quality is the aspect of the home they are most dissatisfied with" and "61.5% of residents stating customer service and communicating is the most difficult part of renting."

e. In a 2024 report Progress prepared "for tomorrow's meeting with [Pretium's CEO]," Progress described problems with its homes not being move-in ready as promised, stating: "Rent ready date changes from what was originally communicated to the pros[p]ect [i.e., the consumer]," and "Right up front we had issues with [the]

rent ready date changing."

f. In a 2024 report that Progress executives shared with Pretium executives, Progress stated: "We historically push back/cancel some [work order] requests" in the first thirty days after consumers move in "as part of an 'as is' expectation setting with residents"; that the top five work orders in the first thirty days are "mechanical or functional, suggesting these issues are not typically 'cosmetic' in nature or related to 'as is' discrepancy"; and that about 10% of residents moving in are "experiencing 5+ [work orders] post move in," which "results in a negative sentiment about Progress."

g. In 2024, Progress and Pretium executives emailed about a report from a public relations firm that had been hired to monitor negative press, including the "Victims of Progress Residential" Facebook group, which detailed consumer complaints about "high anxiety around securing security deposits and avoiding extra charges," "unaddressed maintenance issues," and "deep dissatisfaction with Progress' communication, trustworthiness, and handling of issues, leading to a surge in public complaints and calls for legal action."

h. Another 2024 Progress report shared with Pretium executives

detailed multiple defects with the security deposit process, including: "[n]o defensible standards / transparency on what and when we should charge a resident"; employees use "subjective criteria to charge cleaning and or label damage as resident responsible"; "[t]here are no before-after artifacts" for employees "to determine what changed since move in"; "[n]oncompliant charges not reflective of state regulations"; "inaccurate, inconsistent, rigid" charges to consumers; and only "<35%" of residents receive move-out statements itemizing their security deposit deductions.

174. In addition to knowing about these deceptive and unfair acts and practices, Pretium has also participated in or exercised control over Progress, including instructing Progress to reduce turn budgets and increase fee income—especially through various fees. Pretium has also provided Progress with the parameters and industry and market research to set rent prices and acquire and dispose of homes. Additional examples of Pretium's participation and control include:

a. A 2022 Pretium presentation to investors stated, "Growing ancillary or non-rental income continues to be an area of focus for Pretium's Real Estate Platform."

b. In a 2023 email exchange between Progress and Pretium employees, the employees discussed various fees charged to residents, including the smart home fee that "***Progress/Pretium*** historically has charged [at] $17." (emphasis added.)

c. A 2023 Progress presentation described a fee initiative "[l]ed by Pretium" to explore charging consumers for energy-efficient features in homes.

d. In 2023, a Pretium executive emailed a Progress executive, "One of the agenda items is to talk about our progress on mitigating work order costs."

e. In a 2023 presentation to investors about Progress, Pretium stated that "[m]anaging expenses and enhancing collections programs remains at the forefront of our operational priorities"; "the total cost to maintain per home began to decrease as a result of our internalization initiatives" and "[w]e remain focused on continuing to bring these costs down"; and "[w]e have continued to grow ancillary income through the use of Smart Home technology packages."

f. In a 2024 email, a Progress executive expressed concern about competitors displaying fees with the advertised rent price as

follows: "Have people checked if our peers are doing this? Supportive since we have to move in this direction. ***[Pretium's CEO] just didn't want to get caught doing it before everyone else did***." (emphasis added.)

g. In a 2024 email between Pretium's CEO and other Pretium executives, they discussed a "Progress KPI[13] deck" and how Progress is "over budget on the number of turns" and how "our aggregate turn spend looks well over budget across all of the funds."

175. At all times relevant to this Complaint, Progress has been an agent of Pretium in connection with the provision of Home Rental Services. Progress has served as a property manager for Pretium by managing the tens of thousands of homes owned by Pretium and the investment funds Pretium manages.

176. Additionally, at all times relevant to this Complaint, Pretium has had knowledge of the deceptive and unfair acts and practices alleged above, and Pretium has participated in or exercised control over these acts and practices.

177. Progress and Pretium are both multibillion-dollar companies. Pretium alone has over $62 billion in assets under management, including $32 billion of

---

[13] "KPI" refers to key performance indicators.

real estate equity. Progress has been subject to many actual or threatened legal actions relating to alleged violations of consumer protection laws, including regulations governing disclosures relating to fees and pricing. The FTC has publicly announced two actions involving alleged violations of the GLB Act by competitors of Defendants: *FTC v. Invitation Homes, Inc.*, No. 1:24-cv-04280 (N.D. Ga. Sept. 24, 2024) (alleging that Invitation Homes violated the GLB Act by falsely representing the price of a rental home and the circumstances in which it refunds security deposits, thereby obtaining or attempting to obtain customer information of a financial institution); *FTC v. Greystar Real Estate Partners, LLC*, No. 1:25-cv-00165 (D. Colo. Jan. 16, 2025) (alleging that Greystar violated the GLB Act by using false representations to induce consumers to provide their credit card or bank account information to pay nonrefundable application fees, thereby causing the disclosure of customer information of financial institutions). Progress and Pretium have extensive legal resources, including in-house and outside counsel with expertise in the FTC Act, the GLB Act, and related consumer protection laws and regulations. Accordingly, Progress and Pretium have actual knowledge or knowledge fairly implied on the basis of objective circumstances that their actions are unfair or deceptive and prohibited by the GLB Act.

178. Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Progress and Pretium are violating or are about to

violate laws enforced by the Commission because, among other things: Progress and Pretium engaged in their unlawful acts and practices repeatedly over a period of several years; Progress and Pretium earn millions of dollars each year from participating in these unlawful acts and practices; Progress and Pretium continued their unlawful acts or practices despite knowledge of numerous complaints; and Progress and Pretium stopped or attempted to stop certain unlawful conduct only after they learned that the FTC was investigating them.

## VIOLATIONS OF THE FTC ACT

179. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

180. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

181. Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

## COUNT I
## Misrepresentation of the Total Monthly Rental Price

182. In connection with their Home Rental Services, Defendants represent, directly or indirectly, expressly or by implication, that the advertised monthly rental price is the total monthly rental price to rent one of the homes owned or

managed by Defendants.

183. Defendants' representations are false. In fact, the advertised monthly rental price is not the total monthly rental price that consumers will pay to rent one of Defendants' homes, because it does not include the additional mandatory monthly fees that consumers must pay.

184. Therefore, Defendants' representations as described in Paragraph 182 constitute a deceptive act or practice and the making of false advertisements in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT II**
**Failure to Disclose One-Time and Situational Fees**

185. In connection with their Home Rental Services, Defendants represent, directly or indirectly, expressly or by implication:

a. the cost to rent one of the homes owned or managed by Defendants; and

b. that residents will be charged HOA violation fees upon Defendants' receipt of HOA violation notices.

186. When Defendants make the representation set forth in Paragraph 185, Defendants fail to disclose or disclose adequately to consumers that the cost to rent one of the homes owned or managed by Defendants does not include one-time and situational fees that consumers must pay, including a lease administration fee and renter's insurance exemption fees. This fact or additional information is material to

consumers in deciding whether to proceed with the application process to rent a home, including paying application fees, holding fees, and other expenses to obtain Home Rental Services from Defendants.

187. When Defendants make the representation set forth in Paragraph 185, Defendants fail to disclose or disclose adequately to consumers that Defendants also charge HOA violation fees when they have not received a violation notice, including when Defendants have received notices or other correspondence, such as courtesy reminders, that are not violation notices. This fact or additional information is material to consumers in deciding whether to proceed with the application process to rent a home, including paying application fees, holding fees, and other expenses to obtain Home Rental Services from Defendants.

188. In light of the representations described in Paragraph 185, Defendants' failure to disclose or disclose adequately the material information described in Paragraphs 186-87 constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT III**
**Misrepresentation of Situational Fees**

189. In numerous instances in connection with their Home Rental Services, Defendants represent, directly or indirectly, expressly or by implication, that:

a. Holding fees are refunded within 30 business days if an application is denied or if a home is not available on the agreed-upon move-in

date; and

b. Residents are charged a single $14.95 exemption fee if residents do not provide proof of renter's insurance.

190. In fact, in numerous instances in which Defendants have made the representations described in Paragraph 189, Defendants do not refund holding fees to denied applicants within the promised 30 business days or at all.

191. In numerous instances in which Defendants have made the representations described in Paragraph 189, Defendants do not refund holding fees when a home is not available on the agreed-upon move-in date.

192. In numerous instances in which Defendants have made the representations in Paragraph 189, Defendants actually charge a monthly, recurring $14.95 fee if a resident does not provide proof of renter's insurance, and charge a monthly renter's insurance exemption fee to many residents who have submitted proof of insurance.

193. Therefore, Defendants' representations as described in Paragraph 189 constitute a deceptive act or practice and the making of false advertisements in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT IV**
**Unfair Charges of Erroneous Late Fees to Consumers**

194. In numerous instances in connection with their Home Rental Services, Defendants charge consumers late fees that consumers do not owe.

195. Defendants' acts or practices cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

196. Therefore, Defendants' acts or practices as described in Paragraph 194 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a) and (n).

**COUNT V**
**Misrepresentation of Move-In Ready Homes and Pre-Move-In Inspections**

197. In connection with their Home Rental Services, Defendants represent to potential residents that:

a. They inspect the homes before consumers move in; and

b. The homes are move-in ready.

198. In truth and in fact, in numerous instances in which Defendants have made the representations described in Paragraph 197, Defendants' representations are false and unsubstantiated.

199. Therefore, Defendants' acts or practices as described in Paragraph 197 constitute deceptive acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a).

**COUNT VI**
**Misrepresentation of Deductions Against Security Deposits**

200. In connection with their Home Rental Services, Defendants represent

directly or indirectly, expressly or by implication, that they will only charge consumers’ security deposits for damage the resident causes beyond normal wear and tear of a home.

201. In fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 200, Defendants have charged consumers for amounts that are not their responsibility, including normal wear and tear, damages that pre-dated a resident’s tenancy, and maintenance, repairs, or improvements that are Defendants’ responsibility.

202. Therefore, Defendants’ representations as described in Paragraph 200 are false and misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT VII**
**Unfair Security Deposit Charges**

203. In numerous instances in connection with their Home Rental Services, Defendants have withheld money from consumers’ security deposits or otherwise charged amounts against consumers’ security deposits that consumers do not owe, are not consumers’ responsibility, or for which consumers are not liable.

204. Defendants’ acts or practices cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

205. Therefore, Defendants' acts or practices as described in Paragraph 203 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a) and (n).

**COUNT VIII**
**Misrepresentation of Sending Move-Out Statements**

206. In numerous instances in connection with their Home Rental Services, Defendants represent directly or indirectly, expressly or by implication, that they will send consumers a move-out statement showing any charges or adjustments to their security deposit within thirty days after the move-out date.

207. In fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 206, Defendants have failed to send consumers a move-out statement showing charges or adjustments to their security deposit, either within thirty days after move-out or at all.

208. Therefore, Defendants' representations as described in Paragraph 206 are false and misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT IX**
**Unfair Customer Service**

209. In numerous instances in connection with their Home Rental Services, Defendants have failed to respond, or respond timely or adequately, to consumer complaints or concerns.

210. Defendants' acts or practices cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

211. Therefore, Defendants' acts or practices as described in Paragraph 209 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a) and (n).

## VIOLATIONS OF THE CONSUMER REVIEW FAIRNESS ACT

212. The Consumer Review Fairness Act of 2016 ("CRFA") Pub. L. No. 114-258, 15 U.S.C. § 45b, was enacted on December 14, 2016. As of March 14, 2017, Section 2(b) of the CRFA renders void, and Section 2(c) of the CRFA prohibits the offering of, provisions in form contracts that: prohibit or restrict individual consumers' ability to communicate reviews, performance assessments, and similar analyses about a seller's goods, services, or conduct; or that impose a penalty or fee against individual consumers who engage in such communications. 15 U.S.C. §§ 45b(a)(2), 45b(b)(l), and 45b(c).

213. The CRFA defines a "form contract" as a contract (other than an employer-employee or independent contractor contract) with "standardized terms"—i.e., it is "used by a person in the course of selling or leasing the persons' goods or services" and "imposed on an individual without a meaningful opportunity for such individual to negotiate the standardized terms." 15 U.S.C. §

45b(a)(3).

214. The Commission is authorized to enforce Section 2(c) of the CRFA in the same manner, by the same means, and with the same jurisdiction, powers, and duties as though all applicable terms and provisions of the FTC Act, 15 U.S.C. §§ 41-58, were incorporated into and made a part of the CRFA. 15 U.S.C. § 45b(2)(A). The Commission's enforcement authority under the CRFA applies to contracts in effect on or after December 14, 2017. 15 U.S.C. § 45b(i)(2).

215. Pursuant to Section 2(d)(l) of the CRFA, 15 U.S.C. § 45b(d)(l), a violation of Section 2(c) of the CRFA constitutes a violation of a rule promulgated under Section 18(a)(l)(B) of the FTC Act, 15 U.S.C. § 57a(l)(B), and therefore constitutes an unfair or deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT X**
**CRFA Violation**

216. In numerous instances, since March 14, 2017, Defendants have offered, in the course of selling or leasing their goods or services, form contracts, as that term is defined in 15 U.S.C. § 45b(a)(3), that contain a provision made void by 15 U.S.C. § 45b(b)(1).

217. Therefore, the acts and practices set forth in Paragraph 216 of this Complaint violate the CRFA.

## VIOLATIONS OF THE GRAMM-LEACH-BLILEY ACT

218. Section 521 of the GLB Act, 15 U.S.C. § 6821, became effective on November 12, 1999, and remains in full force and effect. Section 521(a)(2) of the GLB Act, 15 U.S.C. § 6821(a), prohibits any person from "obtain[ing] or attempt[ing] to obtain . . . customer information of a financial institution relating to another person . . . by making a false, fictitious, or fraudulent statement or representation to a customer of a financial institution."

219. The GLB Act defines "customer" to mean "with respect to a financial institution any person (or authorized representative of a person) to whom the financial institution provides a product or service, including that of acting as a fiduciary." 15 U.S.C. § 6827(1). The GLB Act defines "customer information of a financial institution" as "any information maintained by or for a financial institution which is derived from the relationship between the financial institution and a customer of a financial institution and is identified with the customer." 15 U.S.C. § 6827(2).

220. Section 522(a) of the GLB Act, 15 U.S.C. § 6822(a), empowers the FTC to enforce Section 521 of the GLB Act "in the same manner and with the same power and authority as the [FTC] has under the Fair Debt Collection Practices Act [FDCPA] . . . to enforce compliance with such Act."

221. Section 814(a) of the FDCPA, in turn, makes a violation of the

FDCPA an unfair or deceptive act or practice in violation of the FTC Act. 15 U.S.C. § 1692l(a). Section 814(a) of the FDCPA further provides that all of the functions and powers of the FTC under the FTC Act are available to the FTC to enforce compliance by any person with the FDCPA, including the power to enforce provisions of the FDCPA in the same manner as if the violation had been a violation of an FTC trade regulation rule.

222. Thus, pursuant to Section 522(a) of the GLB Act, the FTC may enforce Section 521 of the GLB Act in the same manner as if a violation of the GLB Act were a violation of an FTC trade regulation rule.

223. Section 19 of the FTC Act, 15 U.S.C. § 57b, authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from violations of the FTC trade regulation rules. Accordingly, Section 19 of the FTC Act, 15 U.S.C. § 57b, also authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from violations of the GLB Act. This relief may include, and is not limited to, rescission or reformation of contract, and the refund of money or return of property.

**COUNT XI**
**Use of False, Fictitious, or Fraudulent Statements to Obtain or Attempt to Obtain Customer Information of a Financial Institution**

224. In numerous instances in connection with their Home Rental Services, Defendants have made false, fictitious, or fraudulent statements or representations

to customers of financial institutions to obtain or attempt to obtain customer information of a financial institution such as consumers' bank account, credit card, and debit card numbers, including by representing, directly or indirectly, expressly or by implication, that consumers:

a. could rent Defendants' properties for the advertised monthly rental price;
b. would receive a refund of their holding fee within 30 business days if their application was denied or the home was not move-in ready by the agreed-upon move-in date;
c. would rent homes that are inspected and move-in ready; and
d. would only have their security deposit deducted for damages they cause beyond ordinary wear and tear.

225. Therefore, Defendants' acts and practices as described in Paragraph 224 violate Section 521 of the GLB Act, 15 U.S.C. § 6821.

## VIOLATIONS OF THE ARIZONA CONSUMER FRAUD ACT

226. The Arizona Consumer Fraud Act ("ACFA") prohibits unfair or deceptive trade practices. A.R.S. § 44-1522(A). The Arizona Attorney General is authorized to enforce the ACFA pursuant to A.R.S. § 44-1524.

227. The conduct described in the paragraphs of this Complaint constitutes deceptive or unfair acts or practices, fraud, false pretenses, false promises,

misrepresentations, or concealment, suppression or omission of any material fact with the intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of single-family residential homes, in violation of A.R.S. §§ 44-1521 to 44-1534.

## COUNT XII

### Misrepresentations in Violation of the Arizona Consumer Fraud Act, A.R.S. §§ 44-1521 to 44-1534

228. Plaintiffs reallege all allegations of this Complaint as though fully set forth herein.

229. Defendants engaged in deceptive acts and practices in connection with the leasing and advertisement of home rentals, by:

a. Misrepresenting the conditions of rental homes, including whether they were "move-in ready," habitable, had functional utilities, or were otherwise consistent with the property's advertisements;

b. Falsely stating and/or misrepresenting the total monthly amount that a consumer must pay to rent a home from Defendants;

c. Misrepresenting the Defendants' obligations and tenants' obligations to maintain a rental home as provided in the Arizona Landlord Tenant Act ("ALTA"), A.R.S. §§ 33-1301, *et seq*., including misrepresenting that tenants are responsible for

various costs and fees associated with normal wear and tear that are in fact the Defendants' obligations;

d. Misrepresenting the Defendants' obligations, under the ALTA, to provide essential services (air conditioning, water, electricity), and to timely repair and cover the cost of maintenance and other repairs of such utilities that are not the fault of the tenant; and

e. Misrepresenting the Defendants' willingness and ability to timely respond to requests for repairs or maintenance at Defendants' rental properties.

230. With respect to all unfair and deceptive acts and practices described above, these acts and practices caused or were likely to cause substantial injuries to consumers that were not reasonably avoidable by consumers and were not outweighed by countervailing benefits to consumers or to competition.

231. While engaging in the acts and practices alleged in this Complaint, the Defendants knew or should have known that their conduct was of the nature prohibited by A.R.S. § 44-1522, subjecting them to enforcement and penalties as provided by A.R.S. § 44-1531(A).

## COUNT XIII

### Deceptive Omissions in Violation of the Arizona Consumer Fraud Act, A.R.S. §§ 44-1521 to 44-1534

232. Plaintiffs reallege all allegations of this Complaint as though fully set forth herein.

233. Defendants violated the ACFA in connection with the rental and advertisements of rental homes by concealing, suppressing, or omitting material facts from potential tenants, including:

a. Concealing, suppressing, or omitting the cost of all mandatory monthly fees that are defined as part of tenants' total monthly rent, and hiding these material facts from consumers with the intent that such consumers rely on these concealments, suppressions, or omissions;

b. Omitting material information regarding one-time fees and situation-based fees, including holding fees, lease administration fees, renter's insurance exemption fees, HOA violation fees, and improperly charged late fees;

c. Omitting material information regarding potential deductions from tenant security deposits;

d. Omitting material information regarding the process to request repairs or maintenance, including the fact that such requests

were handled by third-parties and would routinely not be forwarded to the Defendants.

234. Pursuant to Arizona law, a practice of omitting information in connection with the sale and advertisement of merchandise may be a deceptive practice in violation of the ACFA. *State ex rel. Horne v. AutoZone, Inc.*, 229 Ariz. 358, 361 (2012).

235. Defendants routinely made the material omissions specified in this Count, and this pattern of unlawful omissions constitutes deceptive practices in violation of the ACFA.

236. While engaging in the acts and practices alleged in this Complaint, Defendants knew or should have known that their conduct was of the nature prohibited by A.R.S. § 44-1522, subjecting themselves to enforcement and penalties as provided in A.R.S. § 44-1531(A).

## COUNT XIV

### Unfair Business Practices in Violation of the Arizona Consumer Fraud Act, A.R.S. §§ 44-1521 to 44-1534

237. Plaintiffs reallege all allegations of this Complaint as though fully set forth herein.

238. The ACFA prohibits the use of "unfair" acts and practices in connection with the sale or advertisement of merchandise.

239. Unfair acts and practices are those that are harmful to consumers, not

reasonably avoidable by consumers, and not outweighed by countervailing benefits to consumers or to competition.

240. Defendants engaged in unfair acts and practices in connection with the sale and advertisement of single-family rental homes, in violation of the ACFA, by:

a. Failing to provide tenants with itemized descriptions of deductions from security deposits;

b. Improperly withholding security deposits in violation of the ALTA, § 33-1321;

c. Failing to properly disclose all mandatory rental fees;

d. Failing to provide tenants with a reliable and timely process for disputing inappropriate charges, fees, and rent;

e. Failing to provide tenants with a reliable and timely process for submitting maintenance and repair requests; and

f. Failing to otherwise comply with the ALTA.

241. With respect to the unfair acts and practices described above, these acts and practices caused or were likely to cause substantial injuries to consumers that were not reasonably avoidable by consumers and were not outweighed by countervailing benefits to consumers or to competition.

242. While engaging in the acts and practices alleged in this Complaint,

Defendants knew or should have known that their conduct was of the nature prohibited by A.R.S. § 44-1522, subjecting themselves to enforcement and penalties as provided in A.R.S. § 44-1531(A).

## VIOLATIONS OF COLORADO LAW

### COUNT XV
### False or Misleading Statements Concerning Price
### (§ 6-1-105(1)(l), C.R.S.)

243. The Colorado Attorney General incorporates herein by reference all allegations set forth above.

244. The CCPA prohibits a person from making false or misleading statements of fact concerning the price of goods, services, or property or the reasons for, existence of, or amounts of price reductions. § 6-1-105(1)(l), C.R.S.

245. In the course of Defendants' business, vocation, or occupation, Defendants have represented, directly or indirectly, expressly or by implication, that the advertised monthly rental price is the total monthly rental price to rent one of the homes owned or managed by Defendants.

246. Defendants' representations are false and/or misleading. In fact, the advertised monthly rental price is not the total monthly rental price that consumers will pay to rent one of Defendants' homes, because it does not include the additional mandatory monthly fees that consumers must pay.

247. Further, Defendants have made false or misleading statements of fact

by representing one total monthly rental price, while simultaneously failing to disclose that consumers will be required to pay one-time and situational fees, including a lease administration fee and renter's insurance exemption fees.

248. Defendants have also falsely stated to consumers that they are charged a single $14.95 exemption fee if residents do not provide proof of renter's insurance. In reality, Defendants charge a monthly, recurring $14.95 fee if a resident does not provide proof of renter's insurance. Defendants have also charged a monthly renter's insurance exemption fee to many residents who have submitted proof of insurance.

**COUNT XVI**
**Failing to Disclose Material Information**
**(§ 6-1-105(1)(u), C.R.S.)**

249. The Colorado Attorney General incorporates herein by reference all allegations set forth above.

250. The CCPA prohibits a person from failing to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if the failure to disclose such information was intended to induce the consumer to enter into a transaction. § 6-1-105(1)(u), C.R.S.

251. In the course of Defendants' business, vocation, or occupation, Defendants have represented, directly or indirectly, expressly or by implication,

that the advertised monthly rental price is the total monthly rental price to rent one of the homes owned or managed by Defendants.

252. In making these representations, Defendants failed to disclose that the advertised monthly rental price is not the total monthly rental price that consumers will pay to rent one of Defendants' homes, because it does not include the additional mandatory monthly fees that consumers must pay.

253. Defendants further failed to disclose that the cost to rent one of the homes owned or managed by Defendants does not include one-time and situational fees that consumers must pay, including a lease administration fee and renter's insurance exemption fees.

254. Information regarding these recurring and one-time charges was known to Defendants at the time of Defendants' advertisements and sales to consumers, and was material to consumers' decision to use Defendants' services.

255. Defendants' failure to disclose the information was intended to induce consumers to enter into a transaction.

**COUNT XVII**
**False Representation as to the Characteristics of Services – Holding Fees and Move-In Ready Homes**
**(§ 6-1-105(1)(e), C.R.S.)**

256. The Colorado Attorney General incorporates herein by reference all allegations set forth above.

257. The CCPA prohibits a person from either knowingly or recklessly

making a false representation as to the characteristics of goods or services. § 6-1-105(1)(e), C.R.S.

258. In the course of Defendants' business, vocation, or occupation, Defendants have represented that holding fees are refunded within 30 business days if an application is denied or if a home is not available on the agreed-upon move-in date.

259. In fact, in numerous instances in which Defendants have made these representations, Defendants do not refund holding fees to denied applicants within the promised 30 business days or at all.

260. In numerous instances in which Defendants have made these representations, Defendants do not refund holding fees when a home is not available on the agreed-upon move-in date.

261. Additionally, in the course of Defendants' business, vocation, or occupation, Defendants represent to potential residents that they inspect the homes before consumers move in, and the homes are move-in ready.

262. In fact, in numerous instances in which Defendants have made these representations, Defendants' representations are false and unsubstantiated.

**COUNT XVIII**
**Unfair and Deceptive Trade Practices – Late Fees to Consumers**
**(§ 6-1-105(1)(rrr), C.R.S.)**

263. The Colorado Attorney General incorporates herein by reference all

allegations set forth above.

264. The CCPA prohibits a person from knowingly or recklessly engaging in any unfair or deceptive trade practice. § 6-1-105(1)(rrr), C.R.S.

265. In the course of Defendants' business, vocation, or occupation, Defendants have engaged in an unfair and deceptive trade practice by charging consumers unlawful late fees and late fees that consumers do not owe.

266. Defendants' internal reports have acknowledged that "[e]xisting billing processes can cause confusion with residents resulting in late fees that over 30% of the time are manually refunded," and that Progress's numerous errors resulted in improper late fees, including that residents were being "charged late fees even though their rent was paid on time," and "charged late fees for an incorrect balance."

267. Defendants' practice of unlawfully charging late fees (1) violates public policy, including those policies set out in C.R.S. § 38-12-105; (2) is immoral, unethical, oppressive and unscrupulous as Defendants are charging consumers funds without legal justification or to consumers who have not violated Defendants' own rules regarding late fees; and (3) causes substantial consumer injury in the form of hundreds or thousands of dollars for certain consumers.

## COUNT XIX
## Unfair and Deceptive Trade Practices – Security Deposit Withholding
## (§ 6-1-105(1)(rrr), C.R.S.)

268. The Colorado Attorney General incorporates herein by reference all allegations set forth above.

269. The CCPA prohibits a person from knowingly or recklessly engaging in any unfair or deceptive trade practice. § 6-1-105(1)(rrr), C.R.S.

270. In the course of Defendants' business, Defendants unfairly withheld tenants' money from their security deposit for charges beyond those permitted by tenant leases. Defendants know that tenants are not responsible to pay for maintenance that is normal wear and tear, yet they routinely assess these charges to tenants nonetheless, unfairly reducing tenants' security deposit refunds.

271. Defendants' practice of unlawfully withholding security deposits (1) violates public policy, including those policies set out in Colorado Landlord Tenant Statute, C.R.S. § 38-12-101; (2) is immoral, unethical, oppressive and unscrupulous as Defendants are withholding consumers' own funds without justification; and (3) causes substantial consumer injury in the form of hundreds or thousands of dollars for certain consumers.

## VIOLATIONS OF INDIANA'S DECEPTIVE CONSUMER SALES ACT

272. The Indiana Deceptive Consumer Sales Act (DCSA) prohibits suppliers from committing unfair, abusive, or deceptive acts, omissions, or

practices in connection with a consumer transaction. Ind. Code § 24-5-0.5-3(a).

273. Defendants are "supplier(s)" as defined in Ind. Code § 24-5-0.5-2(a)(3), either directly or by an agency relationship.

274. Defendants' activities of leasing homes in Indiana constitute "consumer transactions" as defined by Ind. Code § 24-5-0.5-2(a)(1).

## COUNT XX
## Misrepresentation of the Total Monthly Rental Price

275. The foregoing paragraphs are restated and incorporated herein by reference.

276. Defendants' false representations regarding the total monthly rental price to rent one of the homes owned or managed by Defendants in Indiana constitute unfair, abusive, and deceptive acts in connection with consumer transactions under Ind. Code § 24-5-0.5-3(a).

277. Defendants have knowingly and intentionally misrepresented the total monthly rental amount to rent a home owned or managed by Defendants, thereby committing unfair, abusive, and/or deceptive acts, omissions, and practices in connection with consumer transactions in Indiana as prohibited by Ind. Code § 24-5-0.5-3(a), subjecting them to the enhanced penalties as described in Ind. Code § 24-5-0.5-4(g).

278. Defendants committed a separate and independent violation of the DCSA through each and every unfair, deceptive, false, or misleading

representation or omission of material information when they did so in connection with a lease transaction in Indiana.

**COUNT XXI**
**Failure to Disclose One-Time and Situational Fees**

279. The foregoing paragraphs are restated and incorporated herein by reference.

280. Defendants' failure to disclose one-time and situational fees to potential Indiana tenants constitutes unfair, abusive, and deceptive acts in connection with consumer transactions under Ind. Code § 24-5-0.5-3(a).

281. Defendants have knowingly and intentionally failed to disclose one-time and situational fees practices in connection with consumer transactions in Indiana as prohibited by Ind. Code § 24-5-0.5-3(a), subjecting them to the enhanced penalties as described in Ind. Code § 24-5-0.5-4(g).

282. Defendants committed a separate and independent violation of the DCSA through each and every unfair, deceptive, false, or misleading representation or omission of material information when they did so in connection with a lease transaction in Indiana.

**COUNT XXII**
**Misrepresentation of Situational Fees**

283. The foregoing paragraphs are restated and incorporated herein by reference.

284. Defendants' misrepresentation of situational fees to Indiana consumers constitutes unfair, abusive, and deceptive acts in connection with consumer transactions under Ind. Code § 24-5-0.5-3(a).

285. Defendants have knowingly and intentionally misrepresented situational fees in connection with consumer transactions in Indiana as prohibited by Ind. Code § 24-5-0.5-3(a), subjecting them to the enhanced penalties as described in Ind. Code § 24-5-0.5-4(g).

286. Defendants committed a separate and independent violation of the DCSA through each and every unfair, deceptive, false, or misleading representation or omission of material information when they did so in connection with a lease transaction in Indiana.

**COUNT XXIII**
**Unfair Charges of Erroneous Late Fees to Consumers**

287. The foregoing paragraphs are restated and incorporated herein by reference.

288. Defendants' charges to Indiana tenants for late fees they did not owe constitute unfair, abusive, and deceptive acts in connection with consumer transactions under Ind. Code § 24-5-0.5-3(a).

289. Defendants have knowingly and intentionally charged Indiana tenants late fees they did not owe in connection with consumer transactions in Indiana as prohibited by Ind. Code § 24-5-0.5-3(a), subjecting them to the enhanced penalties

as described in Ind. Code § 24-5-0.5-4(g).

290. Defendants committed a separate and independent violation of the DCSA through each and every unfair, deceptive, false, or misleading representation or omission of material information when they did so in connection with a lease transaction in Indiana.

**COUNT XXIV**
**Misrepresentation of Move-In Ready Homes and Pre-Move-In Inspections**

291. The foregoing paragraphs are restated and incorporated herein by reference.

292. Defendants' misrepresentations to potential Indiana tenants that (1) they inspect the homes before consumers move in and (2) the homes are move-in ready constitute unfair, abusive, and deceptive acts in connection with consumer transactions under Ind. Code § 24-5-0.5-3(a).

293. Defendants have knowingly and intentionally misrepresented to Indiana tenants that (1) they inspect the homes before consumers move in and (2) the homes are move-in ready in connection with consumer transactions in Indiana as prohibited by Ind. Code § 24-5-0.5-3(a), subjecting them to the enhanced penalties as described in Ind. Code § 24-5-0.5-4(g).

294. Defendants committed a separate and independent violation of the DCSA through each and every unfair, deceptive, false, or misleading representation or omission of material information when they did so in connection

with a lease transaction in Indiana.

**COUNT XXV**
**Misrepresentations of Deductions Against Security Deposits**

295. The foregoing paragraphs are restated and incorporated herein by reference.

296. Defendants' misrepresentations that they will only charge Indiana consumers' security deposits for damage residents cause beyond normal wear and tear despite charging them for amounts that are not their responsibility constitute unfair, abusive, and deceptive acts in connection with consumer transactions under Ind. Code § 24-5-0.5-3(a).

297. Defendants have knowingly and intentionally misrepresented to Indiana tenants that they will only charge Indiana consumers' security deposits for damage the resident causes beyond normal wear and tear despite charging them for amounts that are not their responsibility in connection with consumer transactions in Indiana as prohibited by Ind. Code § 24-5-0.5-3(a), subjecting them to the enhanced penalties as described in Ind. Code § 24-5-0.5-4(g).

298. Defendants committed a separate and independent violation of the DCSA through each and every unfair, deceptive, false, or misleading representation or omission of material information when they did so in connection with a lease transaction in Indiana.

## COUNT XXVI
## Unfair Security Deposit Charges

299. The foregoing paragraphs are restated and incorporated herein by reference.

300. Defendants' charges to Indiana consumers' security deposits for amounts they do not owe constitute unfair, abusive, and deceptive acts in connection with consumer transactions under Ind. Code § 24-5-0.5-3(a).

301. Defendants have knowingly and intentionally charged Indiana consumers' security deposits for amounts they do not owe in connection with consumer transactions in Indiana as prohibited by Ind. Code § 24-5-0.5-3(a), subjecting them to the enhanced penalties as described in Ind. Code § 24-5-0.5-4(g).

302. Defendants committed a separate and independent violation of the DCSA through each and every unfair, deceptive, false, or misleading representation or omission of material information when they did so in connection with a lease transaction in Indiana.

## COUNT XXVII
## Unfair Customer Service

303. The foregoing paragraphs are restated and incorporated herein by reference.

304. Defendants' failure to respond, or respond timely or adequately, to

Indiana consumers' complaints and concerns constitutes unfair, abusive, and deceptive acts in connection with consumer transactions under Ind. Code § 24-5-0.5-3(a).

305. Defendants have knowingly and intentionally failed to respond, or respond timely or adequately, to Indiana consumers' complaints and concerns in connection with consumer transactions in Indiana as prohibited by Ind. Code § 24-5-0.5-3(a), subjecting them to the enhanced penalties as described in Ind. Code § 24-5-0.5-4(g).

306. Defendants committed a separate and independent violation of the DCSA through each and every unfair, deceptive, false, or misleading representation or omission of material information when they did so in connection with a lease transaction in Indiana.

**COUNT XXVIII**
**Misrepresentation of Rights and Obligations Under Indiana Law**

307. The foregoing paragraphs are restated and incorporated herein by reference.

308. Defendants' misrepresentation of Indiana law regarding pest control responsibilities and security deposit rights and obligations constitutes unfair, abusive, and deceptive acts in connection with consumer transactions under Ind. Code § 24-5-0.5-3(a).

309. Defendants have knowingly and intentionally misrepresented their

obligations and Indiana consumers' rights under Indiana law in connection with consumer transactions in Indiana as prohibited by Ind. Code § 24-5-0.5-3(a), subjecting them to the enhanced penalties as described in Ind. Code § 24-5-0.5-4(g).

310. Defendants committed a separate and independent violation of the DCSA through each and every unfair, deceptive, false, or misleading representation or omission of material information when they did so in connection with a lease transaction in Indiana.

## VIOLATIONS OF INDIANA'S HOME LOAN PRACTICES ACT

311. The Indiana Home Loan Practices Act (HLPA) prohibits individuals from "engag[ing] in a deceptive act in connection with a mortgage transaction or a real estate transaction," and "represent[ing] that [a real estate] transaction has…(i) certain terms or conditions…that it does not have and that the person knows or reasonably should know it does not have." Ind. Code § 37-5-3-7(c)(3), (5).

312. Under the HLPA, a "real estate transaction" means "the sale or lease of any legal or equitable interest in real estate:" (1) that is located in Indiana; (2) upon which there is constructed or intended to be constructed a dwelling; and (3) that is classified as residential for property tax purposes." Ind. Code § 37-5-3-7(b).

313. A "deceptive act" for the purposes of the HLPA is defined as "an act or a practice as part of a … real estate transaction…, in which a person at the time

of the transaction knowingly or intentionally: (1) makes a material misrepresentation; or (2) conceals material information regarding the terms or conditions of the transaction." Ind. Code § 37-5-2-7(a).

**COUNT XXIX**
**Misrepresentation of the Total Monthly Rental Price**

314. The foregoing paragraphs are restated and incorporated herein by reference.

315. Defendants have knowingly and repeatedly misrepresented the total monthly rental amount to rent an Indiana home owned or managed by Defendants, thereby engaging in a deceptive act in connection with a real estate transaction and representing that such real estate transaction has certain terms that Defendants knew it did not have in violation of Ind. Code § 37-5-3-7(c)(3), (5).

316. Defendants committed a separate and independent violation of the HLPA through each and every deceptive act and misrepresentation regarding the transaction's terms and conditions when they did so in connection with a lease transaction in Indiana.

**COUNT XXX**
**Misrepresentation of Move-In Ready Homes and Pre-Move-In Inspections**

317. The foregoing paragraphs are restated and incorporated herein by reference.

318. Defendants have knowingly and repeatedly misrepresented to

potential Indiana tenants that (1) they inspect the homes before consumers move in and (2) the homes are move-in ready, thereby engaging in a deceptive act in connection with a real estate transaction, in violation of Ind. Code § 37-5-3-7(c)(3).

319. Defendants committed a separate and independent violation of the HLPA through each and every deceptive act when they did so in connection with a lease transaction in Indiana.

## VIOLATIONS OF THE UCSPA

320. Section 4(1) of the UCSPA, Utah Code § 13-11-4(1), prohibits suppliers from engaging in "deceptive act[s] or practice[s] in connection with a consumer transaction . . . whether the deceptive act occurs before, during, or after the transaction."

321. Section 5(1) of the UCSPA, Utah Code § 13-11-5(1), prohibits suppliers from engaging in "unconscionable act[s] or practice[s] in connection with a consumer transaction . . . whether the unconscionable act or practice occurs before, during, or after the transaction."

322. Under the UCSPA, a "supplier" includes "a seller, lessor . . . offeror, . . . or other person who regularly solicits, engages in, or enforces consumer transactions, whether or not the person deals directly with the consumer." *Id.* § 13-11-3(5).

323. The UCSPA defines a "consumer transaction" to include "a sale, lease

. . . or other written or oral transfer or disposition of goods, services, or other property, both tangible and intangible . . . to, or apparently to, a person for . . . primarily personal, family, or household purposes." *Id.* § 13-11-3(a).

324. The UCSPA is a remedial statute intended "to be construed liberally … to protect consumers from suppliers who commit deceptive and unconscionable sales practices." *Id.* § 13-11-2.

325. As described in this Complaint, Defendants regularly engage in the provision of Home Rental Services to consumers for their personal and household use in the State of Utah. Thus, each Defendant is a "supplier" within the meaning of the UCSPA. *Id.* § 13-11-3(5).

**COUNT XXXI**
**Deceptive Acts and Practices in Violation of the UCSPA**

326. The State of Utah incorporates herein by reference all allegations set forth above.

327. In numerous instances in connection with their Home Rental Services, Defendants committed and continue to commit deceptive acts and practices, including by making or causing (whether directly or indirectly, explicitly or by implication) misrepresentations or omissions of material fact to Utah consumers as alleged in this Complaint. These deceptive acts and practices include:

a. Including non-disparagement clauses in rental agreements that restrict consumers from leaving truthful reviews of their

experiences;

b. Including non-disparagement clauses in rental agreements that purport to restrict consumers from reporting their experiences to the Division, the FTC, or other governmental agencies;

c. Failing to respond, or failing to respond timely or adequately, to consumer complaints regarding billing errors, maintenance issues, move-out disputes, and other issues;

d. Advertising a total monthly price that was less than the actual monthly price, including fees that are not disclosed in the rental agreement and/or which do not accurately reflect the fee charged;

e. Accepting payments before disclosing a good-faith estimate of the amount of each fixed, non-rent expense in the rental agreement;

f. Failing to provide timely itemized move-out statements, including statements identifying the basis for any security deposit deductions;

g. Advertising rental units using misleading "photoshopping" or other modification methods to induce consumers to enter into rental agreements;

h. Charging "violation fees" in connection with passing along reminder letters or other notices from applicable HOAs;

i. Unfairly deducting amounts from consumers' security deposits for ordinary wear and tear and other charges not properly attributable to the consumer;

j. Unreasonably delaying and/or refusing to timely return "security deposits" and/or "holding fees"; and

k. Knowingly maintaining the acts and practices alleged in this Complaint despite lack of justification and repeated internal and external warnings.

328. By deceptively engaging in such acts and practices, Defendants have violated and continue to violate the UCSPA, Utah Code § 13-11-4.

**COUNT XXXII**
**Unconscionable Acts and Practices in Violation of the UCSPA**

329. The State of Utah incorporates herein by reference all allegations set forth above.

330. In numerous instances in connection with their Home Rental Services, Defendants committed and continue to commit unconscionable deceptive acts and practices. These unconscionable acts and practices include:

a. Including non-disparagement provisions in their form contracts, those provisions operating to chill consumers' ability to speak with regulators, law enforcement, the press, and other prospective tenants about Defendants' conduct;

b. Inducing consumers to enter into rental agreements through material misrepresentations and other deceptive conduct, then locking consumers into those agreements by making it difficult or impracticable for consumers to exit;

c. Exploiting the financial condition and unequal bargaining power of their tenants by charging mandatory or otherwise undisclosed fees, engaging in unfair security deposit practices, and making material misrepresentations; and

d. Knowingly maintaining the acts and practices alleged in this Complaint despite lack of justification and repeated internal and external warnings.

331. By unconscionably engaging in such acts and practices, Defendants have violated and continue to violate the UCSPA, Utah Code § 13-11-5.

## CONSUMER INJURY

332. Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, CRFA, GLB Act, Arizona's ACFA, Colorado's CCPA, Indiana's DCSA and HLPA, and Utah's UCSPA. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, the Plaintiffs request that the Court:

A. Enter a permanent injunction to prevent future violations of the FTC Act, CRFA, GLB Act, Arizona's ACFA, Colorado's CCPA, Indiana's DCSA and HLPA, and Utah's UCSPA;

B. Award monetary and other relief within the Court's power to grant; and

C. Award any additional relief as the Court determines to be just and proper.

Dated: November 6, 2026

Respectfully submitted,

**FOR PLAINTIFF**
**FEDERAL TRADE COMMISSION**

CHRISTOPHER G. MUFARRIGE
Director, Bureau of Consumer Protection

ANNIE CHIANG
Deputy Director, Bureau of Consumer Protection

NICHOLAS MAY
Regional Director, Southeast Region

MARGUERITE MOELLER
Assistant Regional Director, Southeast Region

*/s/ Michael Boutros*
MICHAEL BOUTROS
Georgia Bar No. 955802
HAROLD KIRTZ
Georgia Bar No. 424070
Federal Trade Commission
401 W. Peachtree Street, NW, Suite 1500
Atlanta, GA 30308
(404) 656-1351; mboutros@ftc.gov
(404) 656-1357; hkirtz@ftc.gov

**FOR PLAINTIFF**
**STATE OF ARIZONA**

*/s/ Heather Hamel*__________________
HEATHER HAMEL
Arizona Bar No. 031734 (*pro hac vice application forthcoming or pending)*
AMANDA SALVIONE
Arizona Bar No. 032136 (*pro hac vice application forthcoming or pending)*
Assistant Attorneys General
ARIZONA ATTORNEY GENERAL'S OFFICE
2005 North Central Avenue
Phoenix, AZ 85004
Phone: (602) 542-7731 (Hamel)
Phone: (602) 542-7757 (Salvione)
consumer@azag.gov
Heather.Hamel@azag.gov
Amanda.Salvione@azag.gov

**FOR PLAINTIFF COLORADO ATTORNEY GENERAL**

PHILIP J. WEISER
COLORADO ATTORNEY GENERAL

*/s/ Monica M. Manning*

MONICA M. MANNING
Georgia Bar No. 105494
Assistant Attorney General
MARTHA U. FULFORD, 53304
Assistant Deputy Attorney General
JULIANNE B. CRAMER, 57111
First Assistant Attorney General
CONOR A. KRUGER, 54111
Assistant Attorney General
Consumer Protection Section
1300 Broadway, 9th Floor
Denver, CO 80203
Tel: (720) 508-6000
Email: monica.manning@coag.gov;
julie.cramer@coag.gov;
conor.kruger@coag.gov

**FOR PLAINTIFF**
**THE STATE OF INDIANA**

TODD ROKITA
Attorney General

*/s/ Chase M. Haller*_______________
By: CHASE M. HALLER
Indiana Bar No. 29944-49
*(pro hac vice application forthcoming or pending)*
Deputy Attorney General
Section Chief Homeowner Protection Unit
Office of the Indiana Attorney General

SCOTT L. BARNHART
Indiana Bar No. 25474-82
Director and Chief Counsel
Consumer Protection Division

REGAN M. PERRODIN
Indiana Bar No. 36333-71
Deputy Attorney General

302 W. Washington Street, IGCS
5th Floor
Indianapolis, IN 46204
Phone: (317) 232-6285
Fax: (317) 232-7979
Email: Chase.Haller@atg.in.gov

**FOR PLAINTIFF**
**STATE OF UTAH**

*/s/ Katie Villani*________________
DEREK BROWN
UTAH ATTORNEY GENERAL
DOUGLAS CRAPO (14620)
*(pro hac vice application forthcoming or pending)*
ROBERT WING (4445)
*(pro hac vice application forthcoming or pending)*
KATIE VILLANI (16654)
*(pro hac vice application forthcoming or pending)*
Utah Attorney General's Office
160 East 300 South, 5th Floor
Salt Lake City, UT 84114
(801) 366-0310
crapo@agutah.gov
rgwing@agutah.gov
kvillani@agutah.gov